CC-2000-516                                                                    1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Arcadio Afanador Irizarry, Margarita González y la Sociedad Legal de Bienes Gananciales <br>    Demandantes-Peticionarios <br><br> v. <br><br> Roger Electric Co., Inc. <br>    Demandado-Recurrido | Certiorari <br><br> 2002 TSPR 56 <br><br> 156 DPR ____ |

Número del Caso: CC-2000-516


Fecha: 26/abril/2002


Tribunal de Circuito de Apelaciones:
                              Circuito Regional III


Juez Ponente:
                              Hon. Andrés E. Salas Soler


Abogados de la Parte Peticionaria:
                              Lcdo. Juan C. Vélez Santana
                              Lcdo. Carlos E. Vega Pérez


Abogados de la Parte Recurida:
                              Lcdo. Daniel A. Cabán Castro
                              Lcdo. José Davison Lampon


Materia: Hostigamiento Sexual y Daños y Perjuicios


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Arcadio Afanador Irizarry,
Margarita González
y la Sociedad Legal de
Bienes Gananciales

    Demandantes-peticionarios

       vs.                              CC-2000-516      CERTIORARI

Roger Electric Co., Inc.

    Demandado-recurrido

Opinión del Tribunal emitida por el Juez Asociado SEÑOR REBOLLO LOPEZ

San Juan, Puerto Rico, a 26 de abril de 2002

Allá para agosto de 1997, el peticionario Arcadio Afanador Irizarry, comenzó a trabajar para el aquí recurrido Roger Electric Inc., en el montaje y establecimiento de una de sus tiendas, en el Municipio de Hatillo. Concluidas dichas labores, Irizarry continuó trabajando como vendedor en dicho establecimiento bajo las órdenes directas de Alberto Rivera, quien fue asignado como supervisor de la referida tienda[1]. Para la fecha de los hechos que nos conciernen, el gerente de esa tienda era Gerardo Vázquez.

---

[1] Este individuo alegaba ser parte de la familia Rivera, dueña de Roger Electric, Co.

Alegadamente desde el momento en que Rivera comenzó sus labores de supervisión en el establecimiento de Hatillo, Irizarry fue objeto de un sinnúmero de incidentes de hostigamiento sexual de parte de su supervisor inmediato.

El acoso de parte de Rivera hacia Irizarry comenzó a manifestarse, alegadamente, con miradas penetrantes y preguntas altamente sugestivas. Con el transcurso del tiempo, su conducta se recrudeció. Rivera no sólo llegó a provocar varios contactos físicos, no deseados por Irizarry, sino que incluso le manifestó a éste —en más de una ocasión y por medio de lenguaje soez— su disponibilidad para sostener junto a él intimidad sexual.[2] Rivera, además, amenazó a Irizarry al advertirle que, si hablaba de lo que había ocurrido, le garantizaba su despido en poco tiempo.

Tras la ocurrencia de cada incidente, Irizarry acudió ante el gerente de la tienda, Sr. Vázquez, para querellarse de lo sucedido. Este intentó "calmarle", diciéndole que habría de notificar lo sucedido a las oficinas centrales al tiempo que le recordaba que "la soga partía por lo más fino", ello en alusión al parentesco existente entre el dueño de la tienda y Rivera. A pesar de los reclamos efectuados ante la gerencia de la tienda, Irizarry siguió siendo objeto de acoso sexual por parte de su supervisor Rivera. Como era de anticiparse, éste acudió nuevamente ante el Sr. Vázquez, manifestándole que la situación por la cual atravesaba lo denigraba como ser humano y le estaba provocando serios problemas en el hogar.

Así las cosas, y ante la inercia de la gerencia del referido establecimiento, Irizarry decidió acudir a la oficina de la Unidad

---

[2] Según surge de los hechos, fueron varias las ocasiones en que Alberto Rivera hizo acercamientos de tipo sexual a su supervisado Afanador Irizarry. Brevemente expuestas, algunas de éstas consistieron en la siguiente conducta: en una ocasión, Rivera miró "de arriba a abajo" a Arcadio y le inquirió si estaba casado, si tenía SIDA y si le había sido leal a su señora; en otro incidente, presionó a Afanador contra una góndola al tiempo que comentaba "a este me lo chicho yo"; le agarró una nalga; ofreció "darle brocha" cuando él [Afanador] quisiera; y        —además— rozó sus genitales

Antidiscrimen en busca de orientación. Conforme con las indicaciones recibidas en dicha oficina, Irizarry redactó una carta en la que expuso los incidentes de hostigamiento que había padecido en su lugar de trabajo, y le entregó la misma, como querella formal, al Sr. Vázquez. Como resultado de la mencionada gestión, Roger Electric Inc. ofreció una disculpa a Irizarry, le solicitó que deshiciera la carta y le expresó que Rivera no trabajaría más allí.

En el entretanto, la situación de salud de Irizarry se había deteriorado, al punto que éste tuvo que ser internado en varias ocasiones con el propósito de recibir tratamiento respecto a una crisis depresiva, alegadamente causada la misma por los actos de hostigamiento sexual de los cuales había sido objeto. De conformidad con las instrucciones médicas que le fueron dadas, Irizarry no regresó a su trabajo. Esta crisis nerviosa y depresiva culminó con la decisión emitida por la Administración del Seguro Social Federal de incapacitar a Irizarry.

El 13 de enero de 1998, Irizarry, su esposa y la sociedad legal de bienes gananciales por ellos compuesta, presentaron una demanda ante la Sala Superior de Arecibo del Tribunal de Primera Instancia contra Roger Electric Inc. en la que alegaron, en síntesis, que el peticionario había sido despedido de su trabajo de forma discriminatoria; específicamente, sostuvieron la existencia de hostigamiento sexual en su modalidad de ambiente hostil y despido injustificado en la modalidad de despido constructivo. A tono con ello, reclamaron salarios dejados de percibir al tipo doble, reposición en el empleo, mesada y daños y perjuicios.

Luego de varios trámites procesales, el tribunal de instancia dictó sentencia en la cual declaró con lugar la demanda interpuesta y condenó a Roger Electric Inc. al pago de las siguientes sumas: $30,000.00 por concepto de los sufrimientos y angustias mentales del demandante más $10,000.00 correspondientes a los daños sufridos por su esposa. Dicho foro concedió al demandante el doble del importe de los daños determinados, de conformidad con las disposiciones de la Ley 100 de 30 de junio de 1959

por la parte posterior del cuello de Afanador mientras éste,

según enmendada, 29 L.P.R.A. sec. 146 et seq.; asimismo, concedió una partida de $2,000.00 para satisfacer el pago de honorarios de abogado y una cantidad indeterminada para el pago de costas y gastos. Finalmente, el referido foro ordenó el pago de la mesada por entender que la renuncia del demandante constituía un despido constructivo. Nada dispuso sobre la procedencia de otras partidas compensatorias.

Inconformes, ambas partes acudieron ante el Tribunal de Circuito de Apelaciones mediante sendos recursos de apelación. Por medio de sentencia emitida el 8 de mayo de 2000, el foro apelativo intermedio confirmó el dictamen apelado. Contra esta determinación, Irizarry interpuso el presente recurso de *certiorari*. Señala que erró el Tribunal de Circuito Apelaciones al:

> ... confirmar en todas sus partes la sentencia emitida por el Tribunal de Primera Instancia Sala de Arecibo cuando dicha sentencia es contrario [sic] a Derecho ya que no le concede a la parte querellante los remedios de las leyes 100, 29 LPRA 146 y sig. y la Ley 17 de 1989 sobre Hostigamiento Sexual en el empleo a saber: salarios dejados de percibir y el lucro cesante, o "front pay".

> ... no disponer sobre el reclamo de Honorarios de Abogado en una suma no menor del 25% de la cuantía otorgada a la parte querellante conforme lo resuelto en <u>López Vicil v. I.T.T.</u>, 97-CA-99 y <u>Burke [sic] v. Martínez</u>, D.P.R. (1998) opinión del 30 de junio de 1998, 98 JTS 92.

<u>Expedimos</u> el recurso; estando en condiciones de resolver el mismo, procedemos a así hacerlo.

I

En nuestro ordenamiento jurídico, el campo del derecho laboral está regulado por un amplio esquema legislativo de cuyos contornos se advierte un interés apremiante tutelado por el Estado, el cual, en términos generales, es la erradicación de las prácticas injustas en el trabajo; ello así en función de la clara política pública que existe para proteger los derechos de los trabajadores. Así lo reafirmamos recientemente en <u>Díaz Fontánez</u> v. <u>Wyndham Hotel Corp.</u>, res. el 24 de octubre de 2001, 2001 T.S.P.R. 141, al reconocer que el contrato de servicios que se formaliza

---

agachado, buscaba un artículo en una góndola.

con el establecimiento de la relación entre el empleado y el patrono constituye --en el gran número de los casos-- el único medio de sustento económico para la clase obrera y sus dependientes por lo cual su ruptura podría conllevar la pérdida de la principal fuente de acceso a los artículos y servicios indispensables para el diario vivir.

Resulta indiscutible, además, la importante contribución que la legislación protectora del trabajo ha hecho tanto en el desarrollo como en la subsistencia del sistema de gobierno democrático que rige en nuestros tiempos. A través de ella, no sólo se ha evitado que la clase obrera utilice la violencia para lograr un mayor grado de justicia en sus condiciones de trabajo sino que, asimismo, se ha alcanzado y mantenido un nivel de paz industrial y laboral, elemento indispensable para la consecución del bienestar social general.[3]

Con respecto al referido esquema legislativo, dentro del cual podemos distinguir diferentes categorías en cuanto al aspecto regulado, hoy nos compete examinar la aplicación, a los hechos específicos del presente caso, de aquélla relativa a la protección de los trabajadores contra el discrimen por razón de sexo en el empleo. Específicamente, el peticionario nos solicita le concedamos todos los remedios que le corresponden al demandante que logra prevalecer en una reclamación por hechos constitutivos de hostigamiento sexual.

No obstante lo anterior, una variable fáctica distingue sus reclamos de los que tradicionalmente llegan ante nuestra consideración: el hecho de que el autor de la conducta constitutiva de hostigamiento sexual, en la vertiente de ambiente hostil, es un supervisor del mismo sexo de la víctima, el aquí peticionario. Los reclamos de Afanador Irizarry articulan de manera implícita una premisa novel en nuestro entorno jurídico: el reclamo de una causa de acción por hostigamiento sexual entre personas del mismo sexo, que no es sino lo que en la esfera federal se ha denominado como el "same-sex sexual harassment".

---

[3] Alberto Acevedo Colom, Legislación Protectora del Trabajo Comentada, Séptima Edición Revisada; San Juan: Ramallo Printing, 2001.

En vista de lo anterior, previo a dilucidar el asunto relativo a la concesión de remedios al amparo de la naturaleza indemnizatoria de los estatutos que proscriben el discrimen por sexo en el empleo, procede examinar los contornos de aplicación de la Ley Contra el Hostigamiento Sexual en el Empleo de manera que podamos determinar si, dada la naturaleza de los hechos de los cuales emana, una reclamación de este tipo encuentra cabida en nuestro ordenamiento. Dicho de otro modo, la cuestión inicial que nos compete aclarar es si los acercamientos de naturaleza sexual no deseada constituyen conducta violatoria de las disposiciones que prohíben el discrimen por sexo en el empleo cuando dicha conducta es cometida por una persona del mismo sexo de la víctima que la ha padecido.

## II

La Constitución del Estado Libre Asociado de Puerto Rico prohíbe expresamente el establecimiento de discrimen alguno por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas.[4] La Sección 8 del Artículo II de nuestra Constitución consagra un principio de comparable reconocimiento[5], el cual le reconoce a toda persona una protección de elevado rango contra todo ataque abusivo a su honra, reputación y vida privada o familiar.

Estos preceptos de raigambre constitucional rigen el ámbito obrero-patronal y están instrumentados en la Ley 100, ante, la cual prohíbe, de manera general, el discrimen en el empleo.[6] Rodríguez Meléndez v. Sup. Amigo, Inc., 126 D.P.R. 117 (1990). Este, en conjunto con otros

---

[4] Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Sec. 1.

[5] Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978).

[6] En la jurisdicción puertorriqueña, la protección contra ciertos tipos de discrímenes es más remota que en el derecho norteamericano. Contrario a la situación en los Estados Unidos, la Asamblea Constituyente de Puerto Rico incluyó una sección en la Carta de Derechos para garantizar el derecho de toda persona a estar libre de actuaciones discriminatorias por razón de sexo, ideas políticas y religiosas, raza, color, origen nacional y condición social. E. García García,

estatutos germanos, forma parte de un ordenamiento integral diseñado por la Asamblea Legislativa para dar vigencia, dentro del contexto de las relaciones obrero patronales, a los valores sobre los cuales se erige nuestra sociedad democrática. Ortiz y otros v. Municipio de Lajas, res. el 30 de marzo de 2001, 2001 T.S.P.R. 44. Para afianzar dichos principios en los centros de trabajo, este entramado de leyes concibe la creación de un "esquema remedial con todos los instrumentos necesarios para reparar a las víctimas de los daños causados por el discrimen en el empleo." García Pagán v. Shiley, 122 D.P.R. 193 (1998).

Como parte de la estrategia para erradicar el creciente problema de hostigamiento sexual en los talleres de trabajo y ante la ausencia de una disposición que expresamente prohibiera el hostigamiento sexual en dicho contexto, la Asamblea Legislativa aprobó la Ley Núm. 17 del 22 de abril de 1988, 29 L.P.R.A. sec. 155 et seq., para establecer, como política pública del Estado Libre Asociado, que el hostigamiento sexual en el empleo es una modalidad de discrimen por razón de sexo, y constituye dicha conducta una práctica asimismo ilegal, indeseable y violatoria del principio constitucional que consagra la inviolabilidad de la dignidad del ser humano. Vélez v. Serv. Legales de P.R., Inc., res. el 21 de enero de 1998, 98 T.S.P.R. 1.

Pese a que la diversidad de conducta humana permite que el discrimen por sexo adquiera varias formas, las reclamaciones de este tipo que conforman tanto nuestra casuística como su equivalente en la esfera federal reconocen, como una constante, dos vertientes: el hostigamiento conocido como *quid pro quo* o algo a cambio de algo, y el hostigamiento sexual por ambiente hostil. Rodríguez, ante.

De estas dos vertientes, la primera se configura cuando el sometimiento o rechazo de los avances o requerimientos sexuales se toma como base para afectar beneficios tangibles en el empleo. En una causa de acción interpuesta bajo esta modalidad, se requiere que el demandante pruebe la solicitud de favores de naturaleza sexual o el padecimiento de

avances de igual tipo y que el sometimiento o rechazo a dicha conducta haya sido la causa de una decisión adversa en cuanto a determinada condición o beneficio de empleo. *Ibid.*

Por otro lado, el hostigamiento sexual por ambiente hostil envuelve conducta de naturaleza sexual por parte del hostigador la cual interfiere irrazonablemente con el desempeño del empleado en su trabajo o es lo suficientemente severa y ofensiva como para crearle al empleado que es víctima de la misma, un ambiente de trabajo que resulte intimidante, hostil y ofensivo. Para establecer un caso *prima facie* bajo esta modalidad, basta con que el hostigamiento se dirija a la víctima únicamente por razón de su sexo; no es necesario que la conducta sea explícitamente sexual ni que le cause un menoscabo económico al empleado afectado.[7] Más bien, lo determinante, para el éxito de una reclamación formulada al amparo de esta modalidad, es que la conducta hostigante --la cual, dicho sea de paso, no puede consistir de un incidente aislado, In re Robles Sanabria, res. el 22 de junio de 2000, 2000 T.S.P.R. 94-- haya causado tal grado de ansiedad y debilitamiento de la estima y confianza propias del demandante que sus condiciones de empleo se hayan contaminado impermisiblemente. Rodríguez v. Sup. Amigo, ante; 29 L.P.R.A. sec. 155b(c).

Así pues, si un examen de la totalidad de las circunstancias[8], dentro de las cuales surge la reclamación, refleja que la conducta alegada --cuyo autor, valga recordar, puede ser cualquier empleado del patrono, el patrono mismo, sus agentes o supervisores-- en efecto constituye hostigamiento sexual, el patrono será responsable civilmente. La determinación de responsabilidad estará sujeta a la relación de empleo

---

Inédito).

[7] A estos efectos, hemos reconocido que no es necesario hacer insinuaciones específicas de corte sexual, emplear vocabulario que tenga connotaciones sexuales como tampoco es necesario contacto físico alguno para que se configure el hostigamiento sexual en el empleo. In re: Robles Sanabria, ante.

[8] Algunas de las circunstancias a ser examinadas son: la frecuencia e intensidad de los alegados actos hostigantes, el contexto en el cual ocurren, y el período durante el cual se prolongan. In re: Robles Sanabria, ante.

existente entre el patrono y la persona que cometió los actos de hostigamiento. 29 L.P.R.A. sec. 155d.

Es un hecho indiscutible que, tradicionalmente, es la mujer la que suele ser la víctima de ataques discriminatorios por razón de su sexo. Esto así, como una consecuencia de los patrones culturales existentes, en los cuales por mucho tiempo se ha concebido al hombre como una figura hegemónica. Exposición de Motivos de la Ley 17, ante., Leyes de Puerto Rico de 1988. No obstante ello, aunque la víctima típica suele ser la mujer, precisa destacar que la magnitud de este problema alcanza tanto a la mujer como al hombre; ambos pueden ser objeto de esta conducta, pues el hostigamiento sexual no es otra cosa que una ofensa repudiable contra la dignidad de todo ser humano que surge como resultado de cualquier conducta indeseada que ocurre en la relación de empleo y tiene un efecto adverso sobre las oportunidades de trabajo, el empleo mismo, sus términos y condiciones, o sobre el ambiente de trabajo en el cual se desempeña la víctima. *Ibid*.

Dada esta realidad, forzoso resulta reconocer que mediante la Ley 17, ante, no sólo se procura erradicar el problema de hostigamiento sexual en el empleo con respecto a su principal víctima, sino que, más bien, se intenta proteger a toda la fuerza laboral del consabido mal social indistintamente del sexo de su autor y de las formas en que pueda manifestarse. Dicho de otro modo, el factor decisivo en una reclamación por conducta constitutiva de hostigamiento no es si la misma se dio dentro de un contexto heterosexual. Más bien, lo determinante es que la conducta discriminatoria se dé en función del sexo de quien la padece, por lo que, si la reclamación satisface los requerimientos establecidos, encuentra cabida dentro del ámbito de protección de la ley.

Así fue reconocido por el Tribunal Supremo de Estados Unidos en el reciente caso de Oncale v. Sundowner Offshore Services, Inc., 118 S.Ct. 998, L. Ed. 2d 201 (1998). Allí, el más alto foro federal tuvo la ocasión de dilucidar una demanda interpuesta por un empleado contra su patrono al amparo de las disposiciones del Título VII de la Ley de Derechos Civiles de 1964, 42 U.S.C. § 2000e-2(a)(1).

En dicho caso, el empleado basó su reclamo de discrimen por razón de sexo en los alegados actos de hostigamiento sexual cometidos en su contra por algunos compañeros de trabajo de su mismo sexo. En ocasión de determinar si la conducta hostigante desplegada en el taller de empleo infringía la prohibición de discrimen por sexo establecida en el Título VII cuando tanto el hostigador como la víctima eran del mismo sexo, el Tribunal Supremo de Estados Unidos no sólo reiteró la posibilidad de que surgieran reclamaciones de conducta discriminatoria entre miembros de determinado grupo, sino que reconoció que ni del lenguaje de la Ley de Derechos Civiles, ante, ni de los precedentes establecidos se desprendía alguna regla de exclusión categórica para reclamaciones de la naturaleza de la allí incoada. En ese sentido, afirmó el referido Foro, a la página 1002, lo siguiente:

> As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonable comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. Title VII prohibits "discrimination… because of… sex" in the "terms" or "conditions" of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements.

Una correcta interpretación y aplicación de nuestro ordenamiento jurídico no puede llevarnos a otra conclusión; resolver lo contrario sería establecer una distinción que, además de carecer de fundamento racional alguno, contravendría la tendencia legislativa que ha ido encaminada a lograr el fiel y verdadero cumplimiento con los mandatos de nuestra Constitución y, asimismo, a darle contenido real al principio establecido en nuestra Carta de Derechos de que la dignidad del ser humano es inviolable. García Pagán v. Shiley, ante. Sin dudas, el reconocimiento de una causa de acción por hostigamiento sexual entre personas del mismo sexo responde al interés consagrado en las leyes laborales, cuya interpretación a favor de aquellos a quienes las mismas intentan proteger, como hemos afirmado anteriormente, ha de ser imperativa. Rosario Toledo v. Distribuidora Kikuet Inc., res. el 29 de junio de 2000, 2000 T.S.P.R. 107.

Resolvemos, en consecuencia, que la reclamación presentada en el presente caso satisface todos los requerimientos de ley por lo que no podemos negarle cabida a los planteamientos del demandante Irizarry. Aclarado este importante aspecto, pasamos a dilucidar los asuntos restantes, relativos éstos a la corrección de las partidas indemnizatorias concedidas al Sr. Arcadio Afanador a la luz de las disposiciones pertinentes.

## III

Como previamente relatáramos, el tribunal de instancia concedió al aquí peticionario Irizarry, las siguientes partidas: $30,000.00 por concepto de los sufrimientos y angustias mentales[9], cantidad que se duplica conforme dispone la ley; una partida de $2,000.00 para satisfacer el pago de honorarios de abogado; una cantidad indeterminada para el pago de costas y gastos así como el pago "correspondiente" de la mesada por entender que la renuncia del demandante constituía un despido constructivo.

El peticionario  sostiene que el foro de instancia erró al no concederle, además de lo anterior, el pago de "los salarios dejados de percibir y el lucro cesante, o 'front pay'." Asimismo, solicita se le conceda una suma por concepto de honorarios de abogado no menor del 25% de la cuantía básica que le fue otorgada, conforme se resolvió en López Vicil v. I.T.T. Intermedia, Inc., 142 D.P.R. 857 (1997). Veamos, a la luz de la normativa aplicable, si al peticionario le asiste la razón.

El Artículo 11 de la Ley 17, ante, dispone, en lo pertinente, que toda persona que cometiere actos de hostigamiento sexual en el empleo incurrirá en responsabilidad civil por una suma igual al doble del importe de los daños que el acto haya causado al empleado. Establece, además, el referido artículo, que el tribunal, al dictar sentencia en las acciones civiles interpuestas bajo las disposiciones en cuestión, podrá ordenar

---

[9] Véase: página 12 de la sentencia del tribunal de instancia.

al patrono que emplee o reponga en su empleo al empleado así como podrá ordenarle al mismo que cese y desista de la práctica discriminatoria.

En cuanto a que la Ley 17, ante, al igual que la Ley 100, ante, dispone que el monto de la compensación será igual al doble del importe de los daños que el acto haya causado, cabe destacar que ello abarca todos los daños sufridos, entiéndase, tanto los daños económicos como los sufrimientos y angustias mentales, siempre y cuando la existencia de éstos quede debidamente establecida por el promovente del pleito. Véase: García Pagán, ante. En dicho caso, se estableció que, tratándose de componentes distintos a ser indemnizados, los daños económicos no absorben los emocionales.

Lo anterior, claro está, no debe generar confusión con respecto a la determinación de las partidas de las cuales es acreedor un empleado que ha sido objeto de actos discriminatorios por parte de su patrono. Es decir, si un demandante presenta una causa de acción contra su patrono por despido injustificado y discriminatorio, de determinar, el tribunal, que el despido, más que injustificado, fue en efecto discriminatorio, no se concederá una indemnización bajo las dos leyes en cuestión (i.e. Ley 80, ante, y Ley 17, ante) pues ello constituiría una doble penalización motivada por unos mismos hechos. Belk Arce v. Martínez y otros, res. el 30 de junio de 1998, 98 T.S.P.R. 109. Habida cuenta de que los remedios a los cuales tiene derecho un empleado que ha sido discriminado compensan adecuadamente todos los daños que pretende atender la Ley 80, en cuanto a ello respecta esta disposición legal queda excluida del panorama adjudicativo.[10] Belk Arce, ante. En este sentido, erró el tribunal de instancia en el presente caso al conceder, además de una partida en daños

---

[10] Y es que, cuando un trabajador es víctima de una violación mayor a un mero despido sin justa causa, las protecciones que le reconocen las disposiciones de legislación social aplicables al caso en particular son, asimismo, superiores al remedio de la mesada, que constituye la única y exclusiva protección que le ampara al empleado que es objeto de un despido injustificado. Ley Núm. 80 de 30 de mayo de 1976, (29 L.P.R.A sec. 185a). Vélez Rodríguez v. Pueblo International, Inc., 135 D.P.R. 500 (1994).

por los actos discriminatorios, el pago de la mesada por haberse configurado un despido constructivo.

Entre los daños que pueden ser compensados al prevalecer en una causa de acción por despido discriminatorio, además de las partidas que se adjudican por concepto de sufrimientos y angustias mentales, se encuentran --como mencionáramos-- los daños patrimoniales. Este tipo de compensación incluye la pérdida económica según los ingresos y beneficios que un demandante dejó de percibir desde la fecha del despido hasta la fecha de la sentencia, Odriozola v. Superior Cosmetic, 116 D.P.R. 485 (1985), y, como veremos más adelante, la pérdida de ingresos futuros, dependiendo de las circunstancias de cada caso. López Vicil v. I.T.T. Intermedia, Inc., ante.

Como hemos destacado previamente, la legislación que proscribe todo tipo de práctica discriminatoria en el empleo tiene como fin principalísimo que la clase trabajadora pueda desempeñarse en un ambiente de trabajo libre de estas prácticas ilegales. Por ello, "es de suponer que el remedio preferente en casos de despido por discrimen sea la reposición en el empleo, siempre que ello sea posible." Véase: López Vicil, ante, a la pág. 866. "De ser ello así, la compensación en concepto de la pérdida económica se limitará a ingresos pasados", López Vicil, ante, a la pág. 867. A contrario sensu, de no ser posible la reposición, el tribunal deberá determinar la compensación por concepto "de daños por pérdida de ingresos futuros". Odriozola, ante, a la pág. 509.

Nótese que el remedio de la reposición constituye la primera alternativa a la cual se debe acudir para indemnizar adecuadamente al empleado que ha sido despedido por razones discriminatorias, indistintamente de la naturaleza del discrimen al cual fuera sometido. No puede ser de otra manera pues, sin dudas, el remedio de la reposición es el más completo. Sólo de esta manera se logra restituir a la persona afectada al estado más cercano al que estaba previo a los actos ilegales padecidos en su lugar de empleo.

Ciertamente, uno de los factores a ser considerados por el tribunal al determinar si es posible la reposición en el empleo es la continuidad

o la ausencia, en el lugar de trabajo, de las condiciones que propiciaron el ambiente discriminatorio. Cabe reconocer que cualquier vestigio de antagonismo o de fricción que prevalezca entre el patrono y el empleado puede constituir un impedimento para la reposición. Odriozola, ante. El tribunal, en el ejercicio de su discreción, tiene el deber de dilucidar si este remedio, aunque sea el más completo, no deba otorgarse pues puede que la totalidad de las circunstancias no favorezcan su concesión.[11] De ser jurídicamente posible la concesión de dicho remedio, "la compensación en concepto de la pérdida económica se limitará a ingresos pasados." López Vicil, ante. (Énfasis suplido.)

De no ser posible la reposición en el empleo, repetimos, el tribunal debe determinar, además, la procedencia de una compensación por ingresos futuros. No cabe duda de que la determinación de una cuantía por concepto de paga prospectiva conlleva un tanto de especulación; no obstante, como hemos reconocido previamente, "ello no puede derrotar el derecho a que se compense por esa pérdida. Nuestros tribunales constantemente están determinando pérdida de ingresos futuros como parte de la indemnización a que tiene derecho la persona que sufre daños por culpa o negligencia de otro. Jurisprudencialmente se han elaborado normas para fijar parámetros al hacerse la determinación de su cuantía." Odriozola, ante.

---

[11] Nuestro esquema legislativo reconoce que la determinación de cuáles remedios son los que proceden descansa en un ponderado ejercicio de discreción del tribunal, el cual se efectúa en consideración de las circunstancias particulares de cada caso. Las disposiciones que regulan esta materia, tanto en nuestra jurisdicción como en la federal, no establecen una concesión automática o mandatoria de todos los remedios reconocidos. Como bien lo expresó el Tribunal Supremo de Estados Unidos en Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975):

> [t]he scheme implicitly recognizes that there may be cases calling for one remedy but not another, and -owing to the structure of the federal judiciary- these choices are, of course, left in the first instance to the district courts. However, such discretionary choices are not left to a court's "inclination, but to its judgment; and its

En el desempeño de esta complicada tarea, los tribunales deben considerar, *inter alia*: si el demandante ha mitigado daños[12]; si ha aportado evidencia de que, hasta la fecha de su retiro, no iba ser posible obtener un trabajo comparable al que tenía previo a los actos discriminatorios; y si la fecha estimada de retiro es una plausible. Véase: Cummings v. The Standard Register Co., 265 F. 3d 56 (1er Cir. 2001).

IV

El foro sentenciador, si bien determinó que el Sr. Irizarry había probado su causa de acción por hostigamiento sexual bajo ambas modalidades, sólo concedió, del amplio aparato remediador antes reseñado, una partida por concepto de sufrimientos y angustias, una cantidad indeterminada para gastos y costas, y una escasa y errónea cifra por concepto de honorarios de abogado.

Surge de los hechos que el peticionario fue declarado incapacitado para trabajar; ello de conformidad con las disposiciones del Seguro Social Federal. Desconocemos, sin embargo, cuál es el grado y la severidad de su incapacidad. Desconocemos, además, si la incapacidad declarada fue consecuencia de los actos discriminatorios acaecidos en su trabajo; éste es un dato de marcada relevancia para la disposición de la presente controversia. Así, sin más, nos vemos impedidos de atribuirle al patrono la responsabilidad por dicha declaración de incapacidad. Hacer lo contrario supondría declarar jurídicamente imposible la reposición y decretar de manera automática la procedencia de la paga prospectiva, todo ello producto de la especulación.

---

judgment its to be guided by sound legal principles."

[12] Al respecto, hemos establecido que el demandante tiene que emplear todos los medios razonables a su alcance para reducir el monto de sus daños. Fresh-O-Baking Co. v. Molinos de P.R., 103 D.P.R. 509 (1975). Lo que razonablemente se requiere del empleado despedido es que esté disponible para trabajar y busque un remedio a su situación. Basta que el demandante demuestre que hizo un esfuerzo razonable para conseguir empleo, el cual no tiene que ser de una categoría o tipo inferior al trabajo anterior. Resta, entonces, al patrono demandado demostrar no solamente que el demandante no fue razonablemente diligente en su búsqueda de un empleo y que, de haberlo sido, seguramente hubiera encontrado empleo disponible, haciéndose, así, de una fuente de ingresos. Odriozola, ante.

Tampoco podemos precisar, de la sentencia emitida por instancia, si la falta de concesión de otros remedios obedeció a que el demandante no logró establecer de manera fehaciente, mediante la evidencia que presentara, que era acreedor a otras partidas compensatorias. La sentencia dictada por el tribunal de instancia, y subsecuentemente confirmada por el foro apelativo intermedio, no menciona específicamente ninguna otra partida. La misma nos crea la impresión de que el tribunal de instancia entendió que la partida otorgada cubría, o "absorbía", todos los daños. Tal cual quedara establecido en García Pagán, ante, aquellos componentes de los daños cuya existencia quede debidamente establecida tendrán que ser considerados, separada y colectivamente, al fijar la responsabilidad total del patrono, la cual equivaldrá a una suma igual al doble del importe de todos los daños causados.

En mérito de lo antes expuesto, procede decretar la revocación de la sentencia emitida por el Tribunal de Circuito de Apelaciones con instrucciones para que el caso sea devuelto al Tribunal de Primera Instancia. Dicho foro deberá determinar si el peticionario efectivamente está, o no, incapacitado y, en caso afirmativo, cuál fue la causa de esa incapacidad; si a la luz de esa determinación, y de las otras circunstancias a considerar en esta clase de situaciones, procede, o no, decretar la reposición de éste en su empleo; en vista a esa determinación, si el peticionario tiene derecho a recibir paga adicional por "pérdida de ingresos futuros"; debiendo cuantificar, de forma separada y colectiva, todos los daños causados y sufridos por el peticionario, esto es, todas las partidas antes mencionadas. Por último, y una vez haya resuelto lo anterior, procederá a computar el foro de instancia la cuantía correcta correspondiente por concepto de honorarios de abogado a tenor con lo resuelto en López Vicil, ante.[13]

---

[13] Allí, en ausencia de una disposición legal que cuantificara numéricamente la razonabilidad de los honorarios en las reclamaciones presentadas al amparo de la legislación laboral, se dispuso que la cuantía que le corresponde al abogado del demandante es equivalente al 25% de la

Se dictará Sentencia de conformidad.


FRANCISCO REBOLLO LOPEZ
Juez Asociado

---

indemnización básica que finalmente se determine; cualquier aumento en exceso de dicha cifra, debe ser justificado mediante memorando jurado. Salta a la vista que el cómputo de honorarios efectuado en el presente caso dista, incluso, del por ciento que hubiese correspondido de haberse computado correctamente a base de la partida que fue  concedida. Es menester enfatizar el deber que tienen los tribunales de velar porque estas disposiciones de ley se cumplan cabalmente.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


**Arcadio Afanador Irizarry,**
**Margarita González**
**y la Sociedad Legal de**
**Bienes Gananciales**

      **Demandantes-peticionarios**

        **vs.**                  **CC-2000-516**      **CERTIORARI**

**Roger Electric Co., Inc.**

      **Demandado-recurrido**


**SENTENCIA**

**San Juan, Puerto Rico, a 26 de abril de 2002**


      **Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de la emitida en el presente caso por el Tribunal de Circuito de Apelaciones, devolviéndose el caso a la Sala Superior de Arecibo del Tribunal de Primera Instancia para procedimientos ulteriores consistentes con lo aquí resuelto.**

      **Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri emitió Opinión de conformidad.**


                            **Patricia Otón Olivieri**
                        **Secretaria del Tribunal Supremo**

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Arcadio Afanador Irizarry,
Margarita González y la
Sociedad Legal de Bienes
Gananciales

     Demandantes-Peticionarios

          v.

Roger Electric Co., Inc.

     Demandado-Recurrido

|  |  |  |
|---|---|---|
| CC-2000-516 | Certiorari |


**Opinión Conformidad emitida por el JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI.**


San Juan, Puerto Rico, a 26 de abril de 2002.


Estoy conforme con la opinión del Tribunal en el caso de autos. Coincido plenamente con el dictamen medular que se formula en dicha opinión de que la legislación de Puerto Rico que prohíbe el hostigamiento sexual en el empleo, 29 L.P.R.A. sec. 155, et seq., abarca las situaciones en las cuales dicho hostigamiento ocurre entre personas del mismo sexo. El Artículo 3 de la legislación referida define el hostigamiento sexual como **"cualquier tipo de acercamiento sexual no deseado"**, lo que claramente incluye los acometimientos sexuales no consentidos de una persona contra otra de su mismo género. El patente tenor literal de dicha definición no permite una interpretación que limite

el hostigamiento referido sólo a los acercamientos entre personas de sexo distintos. Lo que es más importante aún, la legislación en cuestión se aprobó con el ingente propósito de ampliar la vigencia en nuestra vida colectiva del más primordial principio de nuestra Constitución de que la dignidad del ser humano es inviolable; y nadie puede negar que el hostigamiento sexual de una persona contra otra del mismo género constituye una afrenta a la dignidad de ésta. Resulta, pues, que tanto el sentido literal como el propósito de la legislación de Puerto Rico que prohíbe el hostigamiento sexual en el empleo cobija todas las modalidades de ese mal social, incluso cuando ocurre entre personas del mismo sexo.

También estoy conforme con lo que se expresa en la opinión del Tribunal sobre el remedio que se ordena en el caso de autos. En lo principal, procede que el caso se devuelva al foro de instancia para que allí se dilucide si el empleado hostigado está tan incapacitado por razón de los actos discriminatorios de su patrono que no puede reponérsele en el empleo que tenía antes. A pesar de que coincido con lo anterior según indicado en la opinión del Tribunal, deseo por mi parte hacer unas expresiones adicionales sobre el particular.

En el caso de autos, el empleado hostigado por su supervisor de trabajo demandó a su patrono y solicitó que se le indemnizaran los daños sufridos por él y por su esposa como consecuencia del hostigamiento referido. Solicitó también en dicha demanda que se le pagasen los salarios dejados de percibir desde que dejó de trabajar para el patrono demandado; **y que se le repusiera en su empleo**. En la referida alegación ante el foro de instancia, el empleado hostigado no adujo de ningún modo que no podía ser repuesto en su empleo por estar incapacitado. No planteó cuestión alguna sobre dicho asunto por lo que el patrono **no ripostó a ella**. No se trabó, pues controversia alguna allí sobre el particular en las respectivas alegaciones.

En el juicio correspondiente, la limitada prueba presentada, que consistió sólo de los testimonios del empleado y su esposa y de un informe de la Administración del Seguro Social Federal, giró esencialmente en torno a los actos de hostigamiento y a los daños sufridos por los demandantes. **La exposición narrativa de lo acontecido en el juicio del caso de autos refleja claramente que la cuestión de si el empleado no podía ser repuesto a su trabajo por estar total y permanentemente incapacitado para ello no fue examinada allí de modo alguno**. El foro de instancia determinó en esencia que había ocurrido hostigamiento sexual; y que el empleado hostigado y su esposa habían tenido sufrimientos y angustias mentales a consecuencia de ello. Dicho tribunal no dictaminó nada sobre la cuestión de si el empleado hostigado podía ser repuesto o no a su antiguo empleo. **Ciertamente no resolvió que dicho empleado estaba tan incapacitado que no procedía la reposición**.

El empleado demandante acudió entonces ante el Tribunal de Circuito de Apelaciones y adujo que los remedios otorgados por el foro de instancia habían sido incompletos. Dicho foro confirmó la sentencia impugnada, por lo que el empleado hostigado recurrió entonces ante este Tribunal. En lo primordial **nos planteó que tenía derecho a ser repuesto en su**

**empleo** y sólo en caso de no ser ello posible, que tenía derecho entonces a salarios prospectivos hasta los 70 años de edad. Así mismo lo reiteró, además, en su posterior alegato ante nos.

Resulta, pues, que el medular asunto de si el empleado hostigado quedó tan incapacitado por el discrimen patronal **que no podía volver jamás a su trabajo** no sólo nunca estuvo ante el foro de instancia ni fue dilucidado por éste, sino que, además, el propio empleado ha estado solicitando primordialmente la reposición en su empleo. Procede, pues, que se haga en el tribunal de instancia una determinación independiente sobre este asunto, conforme a la prueba que las partes presenten sobre el particular.

II

La necesidad de que el foro de instancia determine conforme a la prueba que se le presente el hecho crucial de si el empleado hostigado no puede ser repuesto a su trabajo por estar total y permanentemente incapacitado para ello por razón de discrimen que sufrió en el empleo se justifica, además, por las circunstancias del caso de autos, según surgen del expediente ante nos, que vistas de modo integral presentan graves interrogantes sobre el particular.

En este caso, el empleado sufrió alguna forma de hostigamiento en cinco ocasiones, según lo relató el propio empleado en el juicio. En la primera ocasión, el hostigamiento consistió en que el supervisor miró al empleado "de arriba a bajo" y le preguntó si era casado, si siempre había tenido la misma esposa y si no tenía SIDA. El empleado de inmediato se querelló al gerente del negocio quien le contestó "dale un breakesito, que él pronto se va de la tienda". El empleado no testificó que este incidente le hubiera causado trauma alguno.

Posteriormente, el 16 de octubre de 1997, ocurrió un segundo incidente. El supervisor hostigador le comentó a otro empleado "a éste me lo chicho yo", a la vez que presionó al hostigado contra la pared. El empleado hostigado testificó que este segundo incidente lo empezó a afectar. Tenía coraje y se sentía humillado.

**El empleado hostigado continuó asistiendo a su trabajo**. En el transcurso de varias semanas mientras trabajaba allí, ocurrieron otros tres incidentes. En uno de ellos el supervisor le agarró una nalga al empleado hostigado; en otro, el supervisor le gritó "[t]ú quieres brocha, yo te doy brocha cuando tú quieras, yo te doy brocha"; y en el último incidente, ocurrido el 28 de noviembre de 1997, el empleado estaba de cuclillas en su trabajo y el supervisor se paró detrás de él y rozó sus genitales por la parte posterior del cuello del empleado.

El empleado testificó en corte que toda esta situación lo había hecho sentir "super mal", que la situación "era insoportable y humillante", que se estaba destruyendo como ser humano, que su familia se había destruido, y que sus hijos estaban pagando las consecuencias porque él llegaba a su casa hostil y denigrado.

El empleado también testificó que ante la inacción del patrono, él acudió a la Unidad Antidiscrimen del Departamento del Trabajo y allí lo orientaron sobre lo que debía hacer. Le explicaron que debía redactar una carta a su patrono exponiendo todos los hechos. Según su propio testimonio en corte, el empleado entonces procedió a redactar la carta referida, y al regresar a su trabajo el 3 de diciembre de 1997 se la entregó al gerente del negocio. Más tarde ese día, el gerente se reunió con el hostigado en su empleo, le pidió perdón por lo acontecido, **le indicó que iban a sacar al hostigador del negocio** y le pidió que destruyera la carta que le había entregado antes querellándose del hostigamiento. **El empleado se negó a romper la carta.**

Según testificó en corte, el hostigado sufrió <u>esa noche</u> una primera "crisis depresiva", por lo que su esposa lo llevó al médico al día siguiente. Fue entonces recluido en una institución psiquiátrica en Cidra, donde permaneció dos semanas. **De ahí regresó estabilizado al hogar**, pero luego, según el testimonio en corte del propio hostigado, volvieron las "crisis depresivas", lo que dio lugar a otras hospitalizaciones breves en otras instituciones psiquiátricas.

En el contrainterrogatorio, el hostigado contestó claramente las preguntas del abogado del patrono. Reiteró todo lo que había testificado antes y añadió algo más. Indicó que inicialmente le había dicho al supervisor hostigador que no le gustaban las bromas de tipo sexual; que no le había dado un golpe a éste en la ocasión en que le había presionado contra la pared, aunque se lo merecía; que no denunció a dicho supervisor por el delito de agresión por ignorancia; que no se querelló por escrito a las oficinas centrales del patrono porque el gerente de la tienda donde trabajaba le había indicado que el hostigador se iría de allí pronto; y que sus relaciones con los otros empleados del negocio eran buenas y que aun después de dejar el trabajo mantenía comunicación con ellos.

Según surge de lo relatado antes, la supuesta incapacidad mental del hostigado se desarrolló esencialmente **después** de éste haber acudido a la Unidad Antidiscrimen del Departamento del Trabajo para orientarse sobre el asunto, y **después** de haber abandonado su trabajo. <u>**Mientras ocurrían los actos de hostigamiento, el empleado continuaba trabajando. Sentía "malestar" pero no estaba incapacitado para continuar trabajando**</u>. La "incapacidad" surgió luego de haberse querellado por escrito y luego de que abandonara su trabajo.

Debe notarse así mismo que el testimonio del empleado hostigado en corte, que aparece transcrito en el expediente de autos, es lúcido, coherente, claro y sagaz, muy distinto a lo que sería razonable esperar de uno que está incapacitado mentalmente de manera permanente.

También debe notarse que el psiquiatra que atendió al empleado hostigado es el mismo <u>**que ordenó todas las distintas hospitalizaciones de éste en varias instituciones psiquiátricas**</u>, como el propio empleado admitió en su recurso de apelación ante el Tribunal

de Circuito de Apelaciones. **Es también el mismo psiquiatra en cuya evaluación descansó la Administración del Seguro Social Federal para declarar incapacitado al empleado**, como el propio empleado admitió ante el tribunal de instancia.

Finalmente, debe notarse que el referido informe de la Administración del Seguro Social Federal, según surge del expediente, era de carácter muy limitado. El foro de instancia, que lo examinó, tuvo reparos con respecto a dicho informe cuando expresó en su sentencia que ese informe carecía de hechos y de determinaciones, salvo la de que el hostigado había advenido incapacitado para trabajar. El propio empleado le admitió al foro de instancia en el memorando referido que ese informe constaba de sólo cinco páginas, y que en su página dos la Administración del Seguro Social indicaba que su decisión en este caso se basaba **sólo en la propia información suplida por el empleado**, refiriéndose a la evaluación del mismo psiquiatra que lo atendió, mencionado antes. Dadas estas circunstancias, el informe por sí solo no es una base suficiente para llegar a una determinación adecuada sobre el hecho crucial que aquí nos concierne.

Más aun, la clara insuficiencia del informe referido tiene otro aspecto que también debe mencionarse. Recientemente, en <u>Clemente Hernández v. Administración de los Sistemas de Retiro</u>, CC-2001-971, resolución del 1 de febrero de 2002, este Tribunal tuvo ante si la impugnación de una sentencia del foro apelativo que trataba sobre una determinación relativa a una pensión por incapacidad ocupacional. **La parte peticionaria había sido declarada incapacitada para trabajar tanto por el Fondo del Seguro del Estado como por la Administración del Seguro Social Federal**. Solicitó del Sistema de Retiro de Empleados del Gobierno que también la declarase incapacitada, apoyándose en las determinaciones del Fondo del Seguro del Estado y de la Administración del Seguro Social Federal. El Sistema de Retiro decidió que debía hacer su propia evaluación del caso y llegó a una decisión distinta a las de esas otras dos agencias en cuanto al asunto de la incapacidad ocupacional. El foro apelativo confirmó el dictamen del Sistema de Retiro. Decidió dicho foro que aunque el Sistema de Retiro debía tomar en cuenta las determinaciones sobre incapacidad ocupacional del Fondo del Seguro del Estado y de la Administración del Seguro Social Federal, éstas no eran de por sí concluyentes para el Sistema de Retiro, y que éste podía hacer una evaluación independiente del asunto debido a que los **criterios** para las respectivas determinaciones de incapacidad **eran distintos**. La afectada entonces acudió ante nos, alegando esencialmente que las determinaciones de incapacidad del Fondo del Seguro del Estado y de la Administración del Seguro Social Federal estaban basadas en pruebas demostrativas de su condición física y emocional.

En el caso referido, denegamos expedir el recurso solicitado, y así confirmamos el dictamen del foro apelativo. Actuamos así, luego de examinar a fondo el recurso en cuestión, por entender que **en efecto las determinaciones de incapacidad de las tres agencias**

**concernidas tenían criterios diferentes, por lo que cada cual tenía la potestad de hacer sus propias evaluaciones independientes de las otras**.

El principio medular que prevaleció en el foro apelativo y en nuestro propio Foro en el caso de <u>Clemente Hernández v. Administración de los Sistemas de Retiro</u>, *supra*, debe regir en el caso de autos. Ello, no sólo porque este Tribunal debe ser consistente al resolver casos similares sino, además, porque el principio normativo referido es el correcto. Las determinaciones de incapacidad ocupacional que hacen distintas agencias administrativas responden a los diferentes fines y propósitos públicos que esas agencias atienden. Como existen para finalidades distintas, tienen sus propios procedimientos y sus propios criterios para resolver las peticiones que se traen ante su consideración. Por ende, tienen la obligación de hacer determinaciones independientes sobre dichas peticiones; y las de unas agencias no son ni pueden ser concluyentes con respecto a las de otras.

Conforme a lo anterior, no puede considerarse aquí que la determinación de incapacidad de la Administración del Seguro Social Federal es de carácter concluyente con respecto a la diferente determinación **judicial** que debe hacerse al amparo de la Ley sobre Hostigamiento Sexual en el Empleo, de si el trabajador hostigado puede o no ser repuesto en su cargo.

IV

En resumen, pues, existen varias importantes razones por las cuales el caso de autos debe devolverse al foro de instancia para que allí se haga una determinación judicial independiente sobre el asunto de si el empleado hostigado está tan incapacitado por los actos discriminatorios del patrono que no puede ser repuesto en su trabajo. Coincido, pues, con este otro crucial aspecto del dictamen del Tribunal.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO