EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Benjamín Díaz Hernández et al.<br><br>Querellantes Recurridos<br><br>v.<br><br>Pneumatics & Hydraulics, Inc. et al.<br><br>Querellada Peticionaria | Certiorari<br><br>2006 TSPR 153<br><br>169 DPR ____ |

Número del Caso: CC-2004-961

Fecha: 17 de octubre de 2006

Tribunal de Apelaciones:

       Región Judicial de Caguas


Juez Ponente:

       Hon. Ismael Colón Birriel

Abogado de la Parte Peticionaria:

       Lcdo. José M. Ramírez Hernández

Abogados de la Parte Recurrida:

       Lcdo. Héctor L. Claudio-Rosario
       Lcdo. Carlos Mondríguez Torres

Materia: Reclamación de Salarios y otros (Procedimiento Sumario)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Benjamín Díaz Hernández *et al.*

    Querellantes Recurridos

v.

Pneumatics & Hydraulics, Inc. *et al.*

    Querellada Peticionaria

CC-2004-961

Opinión del Tribunal emitida por el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 17 de octubre de 2006.

El presente caso nos permite discutir por primera vez las disposiciones del artículo 16 de la Ley de Seguro Social para Choferes y Otros Empleados[1], en adelante Ley de Seguro Social para Choferes. También nos brinda la oportunidad de resolver qué efecto tiene una determinación de incapacidad de la Administración de Seguro Social Federal sobre una reclamación de daños y perjuicios por despido ilegal instada al amparo del referido artículo 16. Por último, en la Opinión discutimos

_____

[1] Ley Núm. 428 de 15 de mayo de 1950, según enmendada, 29 L.P.R.A. sec. 693a.

si procede un reclamo de daños por concepto de angustias mentales bajo el concernido artículo de la ley. Veamos los hechos que originan el presente recurso.

I

El señor Benjamín Díaz Hernández, en adelante señor Díaz Hernández, comenzó a trabajar el 5 de julio de 1995 para Pneumatics & Hydraulics, Inc., en adelante Pneumatics o el patrono, en calidad de mecánico hidráulico, devengando un salario semanal de $320, equivalentes a $1,386 mensuales. Pneumatics es una corporación familiar que se dedica a la venta, instalación y reparación de mangas y efectos hidráulicos para autos y camiones. En su taller, junto al señor Díaz Hernández, trabajaban cuatro mecánicos adicionales, una secretaria, un supervisor y su propio dueño.

A finales de agosto de 1997, el señor Díaz Hernández comenzó a confrontar problemas de salud de naturaleza fisiológica. Experimentó "fuertes y frecuentes dolores de cabeza y comenzó a sufrir de mareos".[2] Sufría de migraña.[3] Padecía también de dolencias en sus vértebras cervicales.[4] A causa de ello, solicitó vacaciones. El patrono le concedió vacaciones desde el

---

[2] Estipulaciones de las partes, Informe Sobre Conferencia Preliminar Entre Abogados, Apéndice del recurso de Certiorari, págs. 84-85.

[3] Testimonio del doctor Néstor Raúl Ortiz Santiago, transcripción del juicio en su fondo, Apéndice del recurso de Certiorari, pág. 260.

[4] Testimonio del señor Benjamín Díaz Hernández, transcripción del juicio en su fondo, Apéndice del recurso de Certiorari, págs. 240-241.

5 de septiembre hasta 20 de septiembre de 1997.[5]  Durante sus vacaciones recibió terapias físicas en el área de su espalda.[6] Luego de regresar de sus vacaciones, el señor Díaz Hernández trabajó hasta el 15 de octubre de ese mismo año, cuando se ausentó del trabajo por no sentirse bien.[7]  Ese día visitó **a su médico de cabecera**, el doctor Néstor R. Ortiz Santiago, en adelante doctor Ortiz Santiago, **especialista en Medicina de Familia**.  En dicha visita, el galeno le diagnosticó "sospecha de una hernia inguinal derecha".[8]  Expidió un certificado médico de fecha 15 de octubre de 1997, que, expresando tal diagnóstico, recomendaba descanso en cama bajo tratamiento médico. Recomendó, además, que el señor Díaz Hernández no regresara a trabajar hasta que se encontrara estable de dicha condición.[9]

En vista de que no se recuperaba, el señor Díaz Hernández visitó nuevamente al doctor Ortiz Santiago el 22 de octubre de 1997.  Éste, luego de examinarlo, le diagnosticó esta vez

---

[5] Estipulaciones de las partes, Informe Sobre Conferencia Preliminar Entre Abogados, Apéndice del recurso de Certiorari, *supra*.

[6] Testimonio del señor Benjamín Díaz Hernández, transcripción del juicio en su fondo, presentada conjuntamente por las partes ante el Tribunal de Apelaciones, *supra*, págs. 240-241.

[7] Estipulaciones de las partes, Informe Sobre Conferencia Preliminar Entre Abogados, Apéndice del recurso de Certiorari, *supra*.

[8] Testimonio del doctor Néstor Raúl Ortiz Santiago, transcripción del juicio en su fondo, *supra*, pág. 284.

[9] Véase certificado médico de fecha 15 de octubre de 1997, Apéndice del recurso de Certiorari, pág. 107.

"depresión mayor severa".[10]  En esa misma fecha, el doctor Ortiz Santiago expidió un certificado médico al respecto.  En el certificado, el doctor recomendó descanso bajo tratamiento médico.  En cuanto a la fecha en que el señor Díaz Hernández podría regresar a trabajar, el certificado médico indica: cuando se encuentre estable ("when stable").[11]

El mismo día 22 de octubre de 1997, la esposa del señor Díaz Hernández, la señora Marilyn Carrión Galarza, en adelante señora Carrión Galarza, visitó el taller de Pneumatics.  Allí entregó el certificado médico en cuestión al señor José Orlando Valentín, Presidente de Pneumatics.[12]  El señor José Orlando Valentín le preguntó a la señora Carrión Galarza cuánto tiempo tardaría su esposo en estabilizarse.  Le explicó a la señora Carrión Galarza que su esposo ya había agotado tanto la licencia de vacaciones como la de enfermedad, por lo que necesitaba que regresara al trabajo o, de lo contrario, se vería en la necesidad de sustituirlo.[13]  Ello, porque contaba con pocos

---

[10] Estipulaciones de las partes, Informe Sobre Conferencia Preliminar Entre Abogados, Apéndice del recurso de Certiorari, *supra*.

[11] Véase certificado médico de fecha 22 de octubre de 1997, Apéndice del recurso de Certiorari, pág. 109.

[12] Estipulaciones de las partes, Informe Sobre Conferencia Preliminar Entre Abogados, *supra*.  Véase, además, Petición de Certiorari, págs. 2-3.  No surge del expediente ante nos el segundo apellido del señor José Orlando Valentín.

[13] Petición de Certiorari, págs. 2-3.

mecánicos y no podía mantener su puesto mucho tiempo sin cubrir.[14]

Así las cosas, la señora Carrión Galarza le solicitó al señor José Orlando Valentín los formularios del Seguro por Incapacidad No Ocupacional Temporal, en lo sucesivo SINOT, con el propósito de que su esposo se acogiera al mismo. No obstante, el señor José Orlando Valentín le indicó que el seguro que cubría a su esposo era el Seguro Social para Choferes y Otros Empleados, en adelante Seguro Choferil, y no el de SINOT.[15]

El 24 de octubre de 1997, el señor José Orlando Valentín cursó una carta al señor Díaz Hernández en la que le reiteró las expresiones vertidas a la señora Carrión Galarza. Específicamente, le advirtió al señor Díaz Hernández que "de extenderse mucho el tiempo" en ausencia por enfermedad, se vería en la obligación de despedirlo, porque ello podría afectar las operaciones del negocio.[16]

La señora Carrión Galarza decidió entonces gestionar el "Formulario para Reclamar Beneficios por Enfermedad" bajo el Seguro Choferil visitando las oficinas del Negociado de Seguro Social para Choferes y Otros Empleados, adscrito al Departamento del Trabajo, agencia que administra el plan de seguro en cuestión. Así, a principios de noviembre de 1997, la señora

---

[14] Testimonio del señor José Orlando Valentín, transcripción del juicio en su fondo, *supra*, págs. 316-317.

[15] Estipulaciones de las partes, Informe Sobre Conferencia Preliminar Entre Abogados, *supra*.

[16] Véase copia de la carta, Apéndice del recurso de <u>Certiorari</u>, pág. 102. Véase, además, testimonio del señor José Orlando Valentín, transcripción del juicio en su fondo, *supra*, pág. 330.

Carrión Galarza acudió a las oficinas del referido Negociado, obtuvo el citado formulario, y lo llevó a las facilidades del patrono para propósitos de cumplimentación.[17]

Cabe destacar que el concernido formulario consta de tres (3) partes: (I) "Informe del Reclamante", (II) "Informe del Patrono" y (III) "Certificado Médico". El reclamante, el patrono y el médico del reclamante cumplimentan aquella parte del formulario que corresponde a cada cual.

La señora Wanda Cotto[18], cuñada y secretaria del señor José Orlando Valentín, cumplimentó y firmó el "Informe del Patrono", en representación de éste, con fecha de 6 de noviembre de 1997.[19] Por su parte, el señor Díaz Hernández cumplimentó el "Informe del Reclamante" el 10 de noviembre de 1997. Sin embargo, la Parte III del formulario, "Certificado Médico", figura cumplimentada y firmada por el doctor Ortiz Santiago el 22 de octubre de 1997, es decir, antes de que la señora Carrión Galarza obtuviera el referido formulario.[20] Según consta en dicha parte del formulario, el señor Díaz Hernández estaba impedido de

---

[17] Estipulaciones de las partes, Informe Sobre Conferencia Preliminar Entre Abogados, *supra*.

[18] No surge del expediente ante nos su segundo apellido.

[19] Estipulaciones de las partes, Informe Sobre Conferencia Preliminar Entre Abogados, *supra*. Véase, además, "Formulario Para Reclamar Beneficios Por Enfermedad" bajo el Seguro Choferil, según fue cumplimentado, Apéndice del recurso de Certiorari, págs. 110-113.

[20] Véase "Formulario Para Reclamar Beneficios Por Enfermedad" bajo el Seguro Choferil, según fue cumplimentado, *supra*. Todo parece indicar que se trata de un descuido del médico. Aparentemente, confundió la fecha de la incapacidad del paciente con la fecha de cumplimentación del documento.

trabajar **desde el 20 de octubre de 1997 hasta aproximadamente el 30 de noviembre del mismo año**, con un diagnóstico de "depresión mayor severa".[21]

El 12 de noviembre de 1997, la señora Carrión Galarza presentó ante el Negociado de Seguro Social para Choferes y Otros Empleados el "Formulario para Reclamar Beneficios por Enfermedad", cumplimentado en todas sus partes.[22] No obstante, la referida dependencia gubernamental denegó la compensación de beneficios por enfermedad al señor Díaz Hernández porque Pneumatics no estaba al corriente en el pago de las primas del seguro.[23]

**El 13 de noviembre de 1997**, el señor Díaz Hernández visitó las oficinas del doctor Ortiz Santiago, quien luego de examinarlo, y encontrarlo en buen estado de salud, lo autorizó a trabajar **a partir del 17 de noviembre de 1997.**[24] Ello implica que le dio de alta antes de la fecha por él originalmente proyectada. El doctor Ortiz Santiago emitió y entregó al señor Díaz Hernández una certificación médica al respecto.[25]

**El 14 de noviembre de 1997**, el señor Díaz Hernández se presentó a su lugar de trabajo para entregar el referido

---

[21] Apéndice del recurso de <u>Certiorari</u>, págs. 112-113.

[22] Estipulaciones de las partes, Informe Sobre Conferencia Preliminar Entre Abogados, *supra*.

[23] Testimonio del señor José Orlando Valentín, transcripción del juicio en su fondo, *supra*, pág. 340.

[24] Estipulaciones de las partes, Informe Sobre Conferencia Preliminar Entre Abogados, *supra*.
[25] Íd. Véase, además, copia del certificado médico, Apéndice del recurso de <u>Certiorari</u>, pág. 101.

certificado. Lo recibió el señor Jorge Santiago Valentín, en adelante señor Santiago Valentín, quien se identificó ante el señor Díaz Hernández como el nuevo supervisor de la compañía. Al recibir el certificado, el señor Santiago Valentín le informó al señor Díaz Hernández que estaba despedido.[26] Una carta de despido dirigida al señor Díaz Hernández había sido firmada por el señor José Orlando Valentín, Presidente de Pneumatics, **con fecha de 13 de noviembre de 1997.** La carta nunca fue entregada al señor Díaz Hernández. Sin embargo, obra en su expediente de personal.[27]

El señor José Orlando Valentín decidió despedirlo porque, según él, había abandonado el trabajo.[28] Además, porque durante el periodo en que el señor Díaz Hernández estuvo ausente por enfermedad, envió a su esposa a buscar en el taller su caja de herramientas, sobreentendiendo de ese hecho que éste no tenía intención de regresar a trabajar.[29]

Así las cosas, el 31 de octubre de 1998, el señor Díaz Hernández, la señora Carrión Galarza, y la Sociedad Legal de

---

[26] Estipulaciones de las partes, Informe Sobre Conferencia Preliminar Entre Abogados, *supra*.

[27] Véase testimonio del señor José Orlando Valentín, transcripción del juicio en su fondo, *supra*, págs. 322-323.

[28] Defensa Afirmativa del patrono, Contestación a Querella, Apéndice del recurso de <u>Certiorari</u>, pág. 73. Véase, además, testimonio del señor José Orlando Valentín, transcripción del juicio en su fondo, *supra*, págs. 320-321.

[29] Testimonio del señor José Orlando Valentín, transcripción del juicio en su fondo, s*upra*, págs. 320-322.

Gananciales por ambos compuesta[30] instaron contra Pnuematics una querella por despido ilegal, al amparo del artículo 16 de la Ley de Seguro Social para Choferes, bajo el procedimiento especial sumario establecido por la Ley Núm. 2 de 17 de octubre de 1961, según enmendada.[31]    Oportunamente, Pneumatics presentó su contestación a la querella.  El 28 de marzo de 2000, la parte querellante presentó, a su vez, una Querella Enmendada.

**En la Querella Enmendada expuso que, aunque la "depresión mayor severa" no estaba relacionada al empleo y era preexistente al despido, el señor Díaz Hernández "estaba mejorando" allá para el 13 de noviembre de 1997, al punto que el médico que le atendía en su depresión lo había autorizado a trabajar a partir del 17 de noviembre de 1997.  La parte querellante sostuvo que el despido del señor Díaz Hernández tuvo el efecto de agravar su condición de "depresión mayor severa".  Alegó que a causa de su despido, dicha condición se agudizó de tal manera que produjo su total incapacidad para generar ingresos.  Puntualizó que, como consecuencia de su despido, se hallaba permanente e irreversiblemente incapacitado para "desempeñarse en ningún trabajo".  Solicitó compensación por concepto de salarios dejados de percibir, pérdida de ingresos futuros o paga**

---

[30] A la fecha del juicio en su fondo, esto es, el 4 de octubre de 2001, el señor Díaz Hernández y la señora Carrión Galarza se encontraban separados.  Ésta última declaró en el juicio que hacía un (1) año y medio que se había separado de su esposo. Testificó que no podía seguir junto a su esposo porque su salud había empeorado y el matrimonio tenía sus conflictos, Apéndice del recurso de <u>Certiorari</u>, pág. 194.

[31] 32 L.P.R.A. sec. 3118 *et seq*.

**prospectiva ("front pay") y daños por angustias mentales, según relacionados en la querella enmendada.**[32]

Finalmente, es menester destacar que el señor Díaz Hernández **obtuvo de la Administración del Seguro Social Federal una determinación de incapacidad con carácter retroactivo al 20 de octubre de 2000.** La pensión por incapacidad que le fue otorgada por dicha Administración asciende a $650 mensuales. Este hecho fue estipulado por las partes al comienzo del juicio en su fondo.[33]

Por su parte, Pneumatics alegó como defensa afirmativa inexistencia de causa de acción. Arguyó que el señor Díaz Hernández fue despedido por abandono de trabajo y que éste no estaba protegido por el artículo 16 de la Ley de Seguro Social para Choferes.[34]

Luego de varios incidentes procesales y tras la celebración del juicio en su fondo, el 18 de junio de 2002, el Tribunal de Primera Instancia dictó Sentencia declarando con lugar la querella. Condenó a Pneumatics a pagar al señor Díaz Hernández las sumas de **$572,000** por concepto de "salarios futuros dejados de percibir" o "lucro cesante" y **$30,000** por concepto de angustias mentales. También lo condenó a pagar a la señora Carrión Galarza la suma de **$15,000** por concepto de angustias

---

[32] Querella Enmendada, Apéndice del recurso de <u>Certiorari</u>, págs. 75-79.

[33] Véase transcripción del juicio en su fondo, *supra*, págs. 164-166.

[34] Contestación a Querella, Apéndice del recurso de <u>Certiorari</u>, págs. 72-73.

mentales.  Por último, le ordenó pagar al representante legal de la parte querellante **$154,250** (veinticinco (25) por ciento de las sumas concedidas) por concepto de honorarios de abogado.

El foro primario concluyó que, a pesar de que el señor Díaz Hernández padecía de una preexistente y no ocupacional condición de "depresión mayor severa", su despido en violación de la reserva de empleo provista por el artículo 16 de la Ley del Seguro Social para Choferes, tuvo el efecto de agravar esa condición al extremo de incapacitarlo permanente e irreversiblemente para trabajar.  Una oportuna moción de reconsideración presentada por Pneumatics fue declarada sin lugar por el foro sentenciador.

Inconforme, el 27 de noviembre de 2002, el patrono presentó un recurso de apelación ante el entonces Tribunal de Circuito de Apelaciones.  Mediante Sentencia dictada el 9 de septiembre de 2004, archivada en autos copia de su notificación a las partes el 21 de septiembre del mismo año, el Tribunal de Apelaciones confirmó en todos sus extremos la sentencia apelada.

Aun insatisfecha, Pneumatics acude ante nos mediante recurso de *certiorari*, presentado el 21 de octubre de 2004, señalando los errores siguientes:

> 1. Erró el Honorable Tribunal de Apelaciones al sostener que la prueba presentada por el apelado en juicio es suficiente en derecho para sostener una condición de agravación de una condición de "depresión mayor severa" diagnosticada antes del alegado despido.
>
> 2. Erró el Honorable Tribunal de Apelaciones al resolver que la determinación de la Administración del Seguro Social Federal es inconsecuente a la apelación presentada máxime cuando para determinar la elegibilidad de ser merecedor de la paga futura (Front Pay) hay que

hacer una determinación de si la incapacidad total fue a consecuencia del despido o no.

3. Erró el Honorable Tribunal de Apelaciones al estimar que en el cómputo del lucro cesante ya se le había aplicado el factor de anualidad de valor presente.

Contando con la comparecencia de ambas partes nos encontramos en posición de resolver.

II

Antes de atender los planteamientos que nos formula la peticionaria en su primer señalamiento de error, debemos discutir la legislación protectora del trabajo al amparo de la cual se originó la querella.

A

La sección 16 de la Carta de Derechos de la Constitución de Puerto Rico[35] consagra el derecho de todo trabajador "a protección contra riegos para su salud o integridad personal en su trabajo o empleo".

La Asamblea Legislativa de Puerto Rico ha aprobado varias leyes para instrumentar ese derecho constitucional y ampliar el alcance de su protección a relaciones obrero patronales entre personas privadas, disponiendo remedios particulares en beneficio de los trabajadores. Así, por ejemplo, se aprobó la Ley de Compensaciones por Accidentes del Trabajo[36], la cual provee a los trabajadores que sufren un accidente en el trabajo o una enfermedad ocupacional, entre otros beneficios, asistencia

---

[35] Art. II, Sec. 16, Const. E.L.A., L.P.R.A., Tomo 1.
[36] Ley Núm. 45 de 18 de abril de 1935, según enmendada, 11 L.P.R.A. sec. 1 *et seq.*

médica, y hospitalaria, medicamentos, además de compensación por incapacidad permanente, incapacidad parcial permanente o por muerte. Del mismo modo, en atención a aquellas situaciones en que los trabajadores sufren una enfermedad o accidente no relacionado a su empleo que los inhabilita para trabajar, la Legislatura aprobó la Ley de Beneficios por Incapacidad No Ocupacional Temporal[37] y la Ley de Seguro Social para Choferes. Estas dos (2) últimas leyes conceden a los empleados, entre otros, un plan de beneficios por enfermedad e incapacidad a través del cual pueden sustituir en parte la pérdida de ingresos sufrida como consecuencia de su incapacidad para trabajar por motivos ajenos al empleo. Específicamente, la Ley de Seguro Social para Choferes, a diferencia de la Ley de Beneficios por Incapacidad No Ocupacional Temporal[38], sólo protege a los choferes y aquellos empleados a quienes su patrono les requiere o permite conducir, usual y regularmente, y no de manera casual o esporádica un vehículo de motor.[39]

La Ley de Seguro Social para Choferes dispone en su artículo 16, en lo hasta ahora pertinente, lo siguiente:

> En los casos de incapacidad para el trabajo de acuerdo con las disposiciones de este capítulo, **el patrono vendrá obligado a reservar el empleo** que desempeña el trabajador al momento de comenzar la

---

[37] Ley Núm. 139 de 26 de junio de 1968, según enmendada, 11 L.P.R.A. sec. 201 *et seq*.

[38] *Supra*.

[39] Ley de Seguro Social para Choferes y Otros Empleados, *supra*, sec. 681(a).

incapacidad **y a reinstalarlo en el mismo, sujeto a las siguientes condiciones:**

(1) Que el trabajador requiera al patrono que lo reponga en su empleo dentro del término de treinta (30) días laborables, contados a partir de la fecha en que fuere dado de alta, y siempre y cuando que dicho requerimiento no se haga después de transcurrido un año desde la fecha de comienzo de la incapacidad;

(2) **Que el trabajador esté mental y físicamente capacitado para ocupar dicho empleo en el momento en que solicite del patrono dicha reposición,** y

(3) Que dicho empleo subsista al momento en que el trabajador solicite su reposición. Se entenderá que el empleo subsiste cuando el mismo esté vacante o lo ocupe otro trabajador. Se presumirá que el empleo estaba vacante cuando el mismo fuere cubierto por otro trabajador dentro de los treinta (30) días siguientes a la fecha en que se hizo el requerimiento de reposición.[40]

Este Tribunal no había tenido ocasión de expresarse en torno a este artículo de la ley en cuestión. Similar en su redacción y contenido al artículo 5(a) de la Ley de Compensación por Accidentes del Trabajo[41] y a la sección 3(q) de la Ley de Beneficios por Incapacidad No Ocupacional Temporal[42], le impone al patrono dos (2) obligaciones relacionadas, pero independientes entre sí. En aquellos casos en que el empleado sufre un accidente o enfermedad *no* ocupacional que lo incapacita para trabajar, el referido artículo 16 compele al patrono a: (1) reservarle el empleo al trabajador por el término de un año, computado desde la fecha de comienzo de la incapacidad y a (2) reinstalarlo en el mismo una vez fuere dado de alta de su

---

[40] *Supra*, sec. 693(a).

[41] *Supra*, sec. 7.

[42] *Supra*, sec. 203(q).

padecimiento. La sabiduría relacional de dichas obligaciones radica en que una reserva de empleo sin derecho a reinstalación carecería de sentido y eficacia protectora para el empleado.

**La obligación del patrono de reservar el empleo únicamente se activa cuando se cumplen las condiciones siguientes:**

(1) que el accidente o enfermedad inhabilite al empleado para trabajar y,

(2) que el empleado se acoja a la licencia especial provista por el artículo 16 de la ley, luego de que su ausencia al trabajo haya sido recomendada por un facultativo médico.

**De otro lado, la obligación del patrono de reinstalar al trabajador en el empleo se activa sólo si éste cumple con las condiciones siguientes:**

(1) formula un requerimiento de reinstalación dentro del término de treinta (30) días laborables a partir de la fecha en que fuere autorizado para trabajar por el facultativo médico que le atiende,

(2) a su vez, hace el requerimiento dentro del término de un año, a partir de la fecha de comienzo de la incapacidad,

(3) está mental y físicamente capacitado para ocupar el empleo en el momento en que requiere la reinstalación.

Finalmente, para que proceda la reinstalación en el empleo, el artículo 16 de la ley en cuestión requiere del cumplimiento de una condición adicional que está fuera alcance del empleado: que el empleo subsista en el momento en que éste hace el requerimiento de reinstalación.

Siendo de raigambre constitucional, el propósito que persigue el artículo 16 de la Ley de Seguro Social para Choferes es de altísimo interés público. El Estado le ha garantizado al trabajador que se incapacita temporeramente como consecuencia de un accidente o enfermedad no ocupacional, "no sólo tranquilidad de espíritu y el sustento de él y de su familia por un tiempo determinado, sino el derecho a ser reinstalado en su empleo".[43]

Según expresáramos antes, los hechos del caso ante nos demuestran que el 22 de octubre de 1997, la co-querellante señora Carrión Galarza visitó el taller de Pneumatics y entregó al señor José Orlando Valentín, un certificado médico expedido por el doctor Ortiz Santiago que certificaba que su esposo, el co-querellante señor Díaz Hernández sufría de "depresión mayor severa". El certificado recomendaba que el señor Díaz Hernández permaneciera en descanso por tiempo indeterminado ("volverá al trabajo 'when stable'"). El señor José Orlando Valentín, después de indicarle a la señora Carrión Galarza que su esposo había agotado sus balances de licencias por vacaciones y enfermedad, le informó que el seguro por incapacidad que a éste cubría no era el de SINOT, sino el Seguro Choferil.

Por otro lado, vimos que dos (2) días más tarde, el señor José Orlando Valentín se comunicó por carta con el señor Díaz Hernández, advirtiéndole que "de extenderse mucho el tiempo" en ausencia por enfermedad, se vería en la obligación de despedirlo. Temprano en el mes de noviembre de 1997, la señora

---

[43] Rojas v. Méndez & Co., Inc., 115 D.P.R. 50, 53 (1984), caso que fue resuelto bajo la similar sección 3(q) de la Ley de Beneficios por Incapacidad No Ocupacional Temporal, *supra*.

Carrión Galarza llevó al taller de Pneumatics el "Formulario para Reclamar Beneficios por Enfermedad" bajo el Seguro Choferil. Éste fue cumplimentado y firmado en sus partes pertinentes por el patrono, por el señor Díaz Hernández y por el doctor Ortiz Santiago. El galeno certificó en dicho formulario que el señor Díaz Hernández estuvo incapacitado para trabajar desde el 22 de octubre de 1997 y que lo estaría hasta aproximadamente el 30 de noviembre de ese año. El 12 de noviembre de 1997, el referido formulario fue presentado personalmente por la señora Carrión Galarza ante el Negociado de Seguro Social para Choferes y Otros Empleados.

Ese 12 de noviembre de 1997, con la presentación del formulario en cuestión debidamente cumplimentado ante la mencionada entidad gubernamental, se activó la reserva de empleo contemplada en el artículo 16 de la Ley de Seguro Social para Choferes. A esa fecha se habían cumplido las condiciones que esbozamos para su activación.

Así las cosas, Pneumatics venía obligada a reservar el empleo que desempeñaba el señor Díaz Hernández, al menos, hasta el 21 de octubre de 1998. Es decir, por espacio de un año a partir de la fecha en que comenzó la presunta "depresión mayor severa" que lo incapacitó para trabajar.

Sin embargo, el 13 de noviembre de 1997, el señor José Orlando Valentín decidió despedir al señor Díaz Hernández por alegado abandono de trabajo. Según vimos, interpretó que éste no tenía intención de regresar a trabajar. Ello, porque era su esposa, y no él, quien estaba haciendo gestiones con relación al

empleo, y porque se había llevado del taller su caja de herramientas. Así, cuando el señor Díaz Hernández visitó el taller el 14 de noviembre de 1997, para entregar un nuevo certificado médico expedido por el doctor Ortiz Santiago, dándole de alta a partir del 17 de noviembre del mismo año, fue verbalmente notificado de su despido.

Es evidente que el señor Díaz Hernández **no abandonó el trabajo.** Desde el 22 de octubre de 1997, notificó la necesidad de ausentarse por enfermedad y la evidenció con una certificación médica que personalmente entregó su esposa al propio señor José Orlando Valentín. A pesar de que ya en ese momento el señor Díaz Hernández había agotado los balances de sus licencias de vacaciones y enfermedad, el señor José Orlando Valentín, a preguntas de la esposa del empleado, la orientó sobre la aplicabilidad al trabajador del Seguro Choferil. Como cuestión de hecho, dicho seguro fue solicitado por el señor Díaz Hernández, activándose la reserva de empleo contemplada en la Ley de Seguro Social para Choferes, según se explicó.

Por otro lado, el señor Díaz Hernández **tampoco demostró una intención de abandonar su empleo.** Fue enteramente razonable que, por estar enfermo, se ayudara de su esposa para excusar sus ausencias y realizar otras gestiones relacionadas a su empleo. Asimismo, el retiro de la caja de herramientas del taller está justificado en el propio testimonio del señor José Orlando Valentín. Éste manifestó en el juicio que, anterior a ello, al señor Díaz Hernández le habían hurtado sus herramientas en el

taller.[44]  Bajo tales circunstancias, también es razonable que, ausente por enfermedad, el señor Díaz Hernández las haya enviado a recoger.

En fin, Pneumatics despidió ilegalmente al señor Díaz Hernández, violando la obligación de reservarle el empleo que le imponía el artículo 16 de la Ley de Seguro Social para Choferes. Ahora bien, ¿qué remedios contempla el artículo de la ley en cuestión ante un despido ilegal como el descrito?

En cuanto a remedios se refiere, el concernido artículo 16 dispone en su último párrafo lo siguiente:

> **Si el patrono no cumpliera con las disposiciones de este inciso, vendrá obligado a pagar al trabajador** o a sus beneficiarios **los salarios que dicho trabajador hubiere devengado de haber sido reinstalado; además le responderá de todos los daños y perjuicios que le haya ocasionado.** El trabajador o sus beneficiarios podrán instar y tramitar la correspondiente reclamación de reinstalación o ambas, en corte por acción ordinaria o mediante el procedimiento para reclamación de salarios establecido en las secs. 3118-3132 del Título 32.[45]

Surge de la cita que, los remedios disponibles bajo el artículo son: reposición en el empleo, salarios dejados de percibir y daños y perjuicios.

En su Querella, el señor Díaz Hernández solicitó los tres (3) remedios. Sin embargo, según indicáramos antes, el señor Díaz Hernández enmendó la misma. Al hacerlo, expuso que su "depresión mayor severa" era preexistente al despido y no relacionada al trabajo en Pneumatics. Alegó que el acto del despido agravó dicha condición al extremo de dejarlo total e

---

[44] Testimonio del señor José Orlando Valentín, transcripción del juicio en su fondo, *supra*, págs. 340-341.
[45] *Supra.*

irreversiblemente incapacitado para trabajar y generar ingresos. En ese momento, al imputarle al patrono la responsabilidad por su alegada incapacidad permanente e irreversible, solicitó como remedio daños por pérdida de ingresos futuros o paga prospectiva ("front pay").

Si la querella no se hubiera enmendado, no habría mayor controversia en cuanto a los remedios a que era acreedora la parte querellante. Simplemente, procedía ordenar la reposición en el empleo del señor Díaz Hernández, el pago de los salarios dejados de devengar hasta la fecha de la reposición y la indemnización de los daños y perjuicios, si alguno, que la parte querellante hubiese probado en el juicio. No obstante, al enmendar la querella en la forma en que lo hizo, la parte querellante tenía que asumir y vencer el siguiente reto probatorio: demostrar mediante preponderancia de la prueba que (1) en efecto padecía con anterioridad al despido de una "depresión mayor severa", (2) que dicha condición se agravó, (3) que existe relación causal entre el acto del despido y la agravación y (4) que la agravación provocada por el despido fue de tal magnitud que lo incapacitó permanente e irreversiblemente para trabajar y generar ingresos. ¿Descargó el señor Díaz Hernández dicha responsabilidad probatoria? Veamos.

B

En su primer señalamiento de error, Pneumatics plantea que el Tribunal de Apelaciones erró al no revocar la Sentencia del Tribunal de Primera Instancia por ausencia o insuficiencia de prueba.

En primer lugar, sostiene que el doctor Ortiz Santiago, y quien fungiera en el juicio como perito del señor Díaz Hernández, no estaba cualificado para declarar sobre materia médico-siquiátrica por ser especialista en medicina de familia y no siquiatra.

La Regla 52 de Evidencia dispone lo siguiente:

Cuando conocimiento científico, técnico o especializado sea de ayuda para el juzgador entender la evidencia o determinar un hecho en controversia, un testigo capacitado como perito en relación con la materia sobre la cual va a declarar podrá testificar en forma de opiniones o de otra manera.[46]

Por su parte, la Regla 53 de Evidencia establece:

(A) Toda persona está cualificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficientes para cualificarla como un experto o perito en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberán ser probados antes de que el testigo pueda declarar como perito.[47]

El peritaje puede ser producto de educación formal, o de conocimientos adquiridos por la experiencia. Así, el lenguaje de la Regla permite que el autodidacta esté cualificado, al igual que el académico con doctorado.[48] La pericia sobre la materia en torno a la cual ha de opinar el testigo perito es lo que justifica que nuestro estado de derecho probatorio admita su declaración como ayuda al juzgador.

---

[46] 32 L.P.R.A. Ap. IV, R. 52.

[47] Íd, R. 53.

[48] E. L. Chiesa, Tratado de derecho probatorio: reglas de evidencia de Puerto Rico y federales, San Juan, Pubs. JTS., 1998, T. I, pág. 562.

La cualificación pericial es una determinación exclusiva del juzgador bajo la Regla 9(A) de Evidencia.[49]  Toda vez que el objetivo perseguido por el ordenamiento jurídico probatorio es que el testigo perito sirva de ayuda al juzgador en el proceso de adjudicación de una controversia, la referida determinación debe producirse mediante un ponderado y juicioso ejercicio de discreción por parte de dicho juzgador. El estándar de revisión de dicha determinación es, precisamente, el de abuso de discreción.

Con relación al planteamiento de falta de capacidad pericial **como siquiatra** del doctor Ortiz Santiago, el Tribunal de Apelaciones únicamente expresó en su Sentencia que la capacidad pericial de éste fue estipulada por las partes en el juicio. Sin embargo, un cuidadoso examen de la transcripción del juicio revela que no hubo tal estipulación.  Nos explicamos.

El proceso de cualificación pericial del galeno se dio mediante su propio testimonio.[50]  Éste declaró que poseía la preparación académica y licencia que el ordenamiento legal y las normas que rigen la práctica de la medicina exigen a un especialista en medicina de familia.  Añadió que tenía un entrenamiento de un año adicional en ciencias de la conducta. Finalmente, se expresó brevemente sobre su experiencia profesional tratando pacientes con problemas emocionales.[51]  Al

---

[49] 32 L.P.R.A. Ap. IV, R. 9(A).

[50] Según lo permite la Regla 53(B) de evidencia, 32 L.P.R.A. Ap. IV.

[51] Véase Apéndice del recurso de Certiorari, págs. 256-260.

concluir su interrogatorio directo, ocurrió entre los abogados de las partes el intercambio verbal siguiente:

> **P   Bien.    Yo voy a detener aquí las preguntas en términos de la [sic] cualificaciones.   Si el compañero tiene alguna.   ¿Estipulamos la capacidad?**
>
> **LCDO.   RAMIREZ:**
>
> <u>**Bueno, estipulamos que toda la información es cierta y están [sic] dentro de los parámetros de las leyes del ejercicio de la medicina en Puerto Rico**</u>**.**
>
> **LCDO. MONDRIGUEZ:**
>
> **P   Bien.   Pues vamos entonces a continuar. ¿Cómo conoció usted a Benjamín Díaz Hernández?** (énfasis nuestro).[52]

Evidentemente, el representante legal de Pneumatics no estipuló que el doctor Ortiz Santiago era siquiatra ni que tenía capacidad para testificar como tal.  A lo sumo, estipuló que era un especialista en medicina de familia, con un año académico adicional en ciencias de la conducta.  Erró el Tribunal de Apelaciones al atribuirle a las expresiones del abogado de Pneumatics un alcance distinto.

Ahora bien, **¿abusó de su discreción el Tribunal de Primera Instancia al aceptar que un especialista en medicina de familia fungiera como perito de la parte querellante en este pleito? ¿Erró el Tribunal de Apelaciones al confirmar dicha actuación?** Según mencionáramos, la peticionaria postula que el galeno no estaba cualificado para opinar como perito por no ser siquiatra. Veamos.

---

[52] Íd., pág. 260.

Este Tribunal ha señalado que la carencia de determinada especialidad afecta el peso de la prueba pericial pero no la cualificación del perito.[53] Así, hemos resuelto que, aunque prevalece un enfoque interpretativo liberal de la Regla 53 de Evidencia[54], y no empece a que bajo este enfoque un generalista y un especialista cualifican ambos como peritos, el especialista está en mejor posición respecto al valor probatorio de su opinión. Es decir, la mayor o menor competencia del perito donde cobra relevancia es en la apreciación del valor probatorio de su declaración.[55]

El valor probatorio del testimonio pericial está subordinado al análisis de determinados factores. Por ejemplo: (1) las cualificaciones del perito, (2) la solidez de las bases de su testimonio, (4) la confiabilidad de la ciencia o técnica subyacente y (4) la parcialidad del perito.[56]

En casos de impericia médica le hemos dado carácter decisivo, pero en cuanto a valor probatorio se refiere, a la especialidad del médico perito. Como cuestión de hecho, en Vda.

---

[53] Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R., 150 D.P.R. 658, 664 (2000), citando a E. L. Chiesa, Tratado de derecho probatorio: reglas de evidencia de Puerto Rico y federales, San Juan, Pubs. JTS., 1998, T. I, pág. 565 y a Payton v. Abbott Labs., 780 F.2d 147, 155 (1er Cir. 1895).

[54] Supra.

[55] Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R., supra, págs. 663-665.

[56] E. L. Chiesa, Práctica Procesal Puertorriqueña: Evidencia, San Juan, Pubs. J.T.S., 1983, V. I, pág. 244.

de Torres v. Womble[57], avalamos la determinación que hiciera el tribunal sentenciador a los efectos de negarle crédito a las declaraciones de un perito médico por no ser un "especialista en el campo genito-urinario".

Asimismo, en Ríos Ruiz v. Mark[58], un caso en el que estaba en controversia si el médico demandado había incurrido en mala práctica de la medicina al recetar determinado medicamento oftálmico, revocamos la sentencia que declaró con lugar la demanda, principalmente por el escaso valor probatorio que nos mereció el testimonio del perito de la parte demandante. Dicha parte utilizó como perito un doctor en medicina deportiva, que no tenía "estudios especializados en oftalmología ni en dermatología".[59]

No vemos razones para que la normativa antes expuesta relativa a la cualificación pericial no sea igualmente aplicable a reclamaciones de daños y perjuicios por despido ilegal bajo las disposiciones del artículo 16 de la Ley de Seguro Social para Choferes.

En consecuencia, resolvemos que el Tribunal de Primera Instancia no abusó de su discreción al aceptar la capacidad del doctor Ortiz Santiago para declarar en el juicio en calidad de perito. A la luz del actual estado de derecho, el testimonio del propio galeno, identificándose como médico con especialidad

---

[57] 99 D.P.R. 859 (1971).

[58] 119 D.P.R. 816 (1987).

[59] Íd., pág. 825.

en medicina de familia, con una preparación académica de un año adicional en ciencias de la conducta, era suficiente **para cualificarlo** como perito en el presente caso. A lo sumo, el no ser siquiatra, sólo podía tener efectos en el **valor probatorio** de su testimonio. Aunque por distinto fundamento, concluimos que el Tribunal de Apelaciones actuó correctamente al no intervenir con la determinación de cualificación pericial que hiciera el foro primario.

Por otro lado, Pneumatics plantea **(1)** que la prueba pericial que tuvo ante sí el Tribunal de Primera Instancia no sostiene su conclusión al efecto de que el señor Díaz Hernández sufrió una **agravación** de su preexistente y no ocupacional condición de "depresión mayor severa". Arguye, además, **(2)** que la prueba pericial falló en establecer una **relación de causa y efecto** entre el acto del despido y la presunta agravación de la condición. Señala que, al igual que el foro primario, el Tribunal de Apelaciones incidió al apreciar la prueba pericial presentada por la parte querellante a esos efectos.

Nos reafirmamos en la norma de que, como foro apelativo, tenemos amplia discreción en la evaluación de la prueba pericial. No estamos obligados a "seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito facultativo". Tenemos plena libertad de adoptar nuestro propio criterio en la apreciación de la prueba pericial. Inclusive, podemos descartarla aunque resulte técnicamente correcta.[60]

---

[60] Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R., 150 D.P.R. 658, 662-663 (2000); Culebra Enterprises Corp. v. E.L.A., 143 D.P.R.

Examinemos primero la prueba pericial desfilada en torno a la **agravación** de la condición emocional.

El doctor Ortiz Santiago declaró en el juicio que el 22 de octubre de 1997, comenzó a brindarle tratamiento al señor Díaz Hernández con medicamentos antidepresivos (aunque al ser contrainterrogado sobre el particular, no pudo precisar cuáles fueron los medicamentos que le recetó). Indicó que el paciente regresó a su oficina el 13 de noviembre de 1997, expresándole que se sentía mejor. Testificó que en ese momento lo encontró con ciertos rasgos de depresión, pero capacitado para volver a su trabajo. Añadió que, por ello, lo autorizó a trabajar a partir del 17 de noviembre de 1997, bajo tratamiento médico (el cual no especificó), y con cita de reevaluación en dos semanas.[61]

El doctor Ortiz Santiago testificó que "sus notas" indicaban que, con posterioridad al 13 de noviembre de 1997, tuvo que referir al paciente a un siquiatra porque su condición "decayó". No especificó la fecha en que hizo el presunto referido. Tampoco el nombre del siquiatra. Indicó que "tenía entendido" que el señor Díaz Hernández fue hospitalizado por recomendación del siquiatra, a raíz de la depresión. Así, declaró que cuando el paciente "vuelve en el '98", lo encontró "con una depresión ya mayor", que incluía rasgos paranoicos y sicóticos. Afirmó

---

935 (1997); Valldejuli Rodríguez v. A.A.A., 99 D.P.R. 917, 921 (1971); Prieto v. Maryland Casualty Co., 98 D.P.R. 594, 623 (1970).

[61] Véase testimonio del doctor Néstor Raúl Ortiz Santiago, transcripción del juicio en su fondo, *supra*, págs. 266-275 y 287.

que tales rasgos no habían sido detectados en el paciente al 13 de noviembre de 1997.[62]

**El perito testificó que la última vez que vio al señor Díaz Hernández fue <u>"en el '99"</u>, época en que se encontraba bajo el cuidado médico del siquiatra.** Expresó que desconocía el nombre del siquiatra. Declaró que en ese entonces el paciente seguía en depresión mayor y "medicado totalmente", incapacitado para trabajar.[63]

En segundo lugar, examinemos la prueba pericial desfilada en torno al elemento de **causalidad** entre la alegada agravación de la condición médica y el acto del despido.

El doctor Ortiz Santiago manifestó en su interrogatorio directo lo siguiente:

> P [o]iga, ¿y qué pasó luego con ese paciente? ¿Volvió o no volvió? ¿Sabe usted si pudo volver a trabajar?
>
> R Bueno, <u>me entero luego por … por … pues porque he sido citado a corte para deponer</u> en otras ocasiones y que no se han dado, <u>que él perdió el trabajo</u> (énfasis nuestro).[64]

En su contrainterrogatorio, abordado sobre este mismo asunto, expresó:

> P Usted testificó que usted solamente decidió darle tratamiento médico y <u>usted dijo respecto al aspecto del empleo que no se había enterado que había habido unos incidentes hasta que entró en procedimiento judicial</u>.
>
> R <u>Unjú</u>.
>
> P Eso fue lo que entendí. ¿Es cierto?

---

[62] Íd., págs. 277-278.

[63] Íd., págs. 280 y 306.

[64] Íd., pág. 277.

R   Unjú.[65]

.......

P   ¿Cuándo usted entiende que el señor Benjamín Díaz entra en una condición que no puede estar bajo su cuidado y que amerita mayor condición [sic] usted lo refiere responsablemente a un especialista de la conducta humana?

R   A un siquiatra.

P   ¿Pero en ningún momento durante todo ese proceso [sic] hasta que usted en noviembre, diciembre, a finales del '97 y principios del '98, [sic] cierto?

R   Sí.

P   Hasta esa fecha en ningún momento usted tenía conocimiento que hubo unos problemas y que la condición de depresión mayor severa tenía que ver algo o tenía relación con el empleo.  Usted lo estaba tratando por la condición, pero no sabía qué le causó la condición.

R   Unjú (énfasis nuestro).[66]

.......

P   ¿Y dentro de las circunstancias es probable, no posible, probable, que los hechos que dan margen al … al resultado final pudieron suceder tres, cuatro meses antes de un incidente que hubo con el despido?

R   Yo no tengo constancia de eso (énfasis nuestro).[67]

El estudio independiente de la prueba pericial desfilada en el juicio nos lleva, por un lado, a no alterar la conclusión del Tribunal de Primera Instancia, refrendada por el Tribunal de Apelaciones, a los efectos de que el señor Díaz Hernández sufrió una agravación de su preexistente y no ocupacional condición de

---

[65] Íd., págs 291-292.

[66] Íd.

[67] Íd., pág. 295.

"depresión mayor severa".  Las declaraciones no contradichas del doctor Ortiz Santiago, aunque no representan la máxima aspiración de un testimonio pericial confiable[68], son suficientes para concluir que hubo tal agravación.  Nótese que el perito declaró que, en un principio, el señor Díaz Hernández no presentaba rasgos paranoicos ni sicóticos.  Según testificó, éstos aparecieron más tarde.  Añadió que en ese momento el señor Díaz Hernández necesitó la ayuda médica de un siquiatra.  Por lo tanto, actuó correctamente el Tribunal de Apelaciones al sostener la conclusión de agravación de la condición emocional.

Ahora bien, ese mismo estudio independiente de la prueba pericial nos convence de que el señor Díaz Hernández no descargó su responsabilidad probatoria de demostrar la existencia de relación causal entre la agravación de su condición y el acto del despido.  Salta a la vista la admisión del doctor Ortiz Santiago, a preguntas de los abogados de ambas partes, de que no conoció del despido sino hasta que fue citado a una deposición, como parte del presente proceso judicial.

---

[68] A modo de ilustración, llama la atención que el expediente médico del paciente, si hubo alguno, no se sometió en evidencia. El galeno testificó, refrescando su memoria con copia de "unas notas" alegadamente suyas, que a última hora, el abogado que lo presentó como testigo le entregó, estando ya en la silla testifical.  Véase apéndice del recurso de Certiorari, págs. 261-265.  Tales notas tampoco fueron sometidas en evidencia. Desconocemos su autenticidad.  El doctor no redactó un informe pericial.  Tampoco pudo precisar qué medicamentos antidepresivos recetó al señor Díaz Hernández.  No especificó qué tratamiento médico le dio a partir del 17 de noviembre de 1997.  De paso, cabe destacar que, aunque el galeno declaró que se enteró que su paciente fue hospitalizado por la depresión, la parte querellante, tampoco desfiló como prueba expediente hospitalario alguno del señor Díaz Hernández.

Como sabemos, el señor Díaz Hernández fue notificado de su despido el 14 de noviembre de 1997. Ello implica que, a pesar de que el doctor Ortiz Santiago continuó brindándole atención médica por la depresión con posterioridad al despido, y no empece a que su condición se agravó en una fecha posterior al mismo, el señor Díaz Hernández nunca le comunicó a su médico de cabecera que había sido despedido por su patrono. Es decir, nunca le manifestó al médico que le atendía su condición de depresión, que Pneumatics lo había despedido al día siguiente de éste haber entregado en el taller el certificado médico de alta para trabajar.

**Si el señor Díaz Hernández alega en su querella enmendada que el acto del despido fue tan catastrófico para él, que no sólo tuvo el efecto de agravar su condición, sino que le precipitó una incapacidad permanente e irreversible, ¿no es lógico pensar que le hubiese dado conocimiento de tan significativo evento al médico que le atendía en su depresión? Por supuesto que sí, mas no lo hizo. Irónicamente, fue el patrono quien enteró al doctor Ortiz Santiago del despido del señor Díaz Hernández al citarlo a la toma de una deposición.** Las declaraciones vertidas en el juicio, tanto por el señor Díaz Hernández como por su esposa, intentando establecer una conexión entre el acto el despido y la agravación de la condición emocional quedan, a la luz de lo anterior, reducidas a unas de escaso valor probatorio. Erró en su apreciación de la prueba pericial el Tribunal de Apelaciones al concluir sobre la

existencia de relación causal entre el acto del despido y la agravación de la condición emocional.

**Por otro lado, resulta de singular trascendencia el hecho de que el doctor Ortiz Santiago "vio" al paciente por última vez en el año 1999.**[69] En su testimonio, no precisó mes ni día. Sin embargo, el Tribunal de Primera Instancia concluyó que la prueba pericial estableció inequívocamente que el acto del despido provocó la eventual incapacidad permanente del señor Díaz Hernández.[70] El Tribunal de Apelaciones refrendó tal actuación.

**Si el juicio se celebró el 4 de octubre de 2001, y la única prueba médica desfilada en el juicio, entiéndase los certificados médicos expedidos por el galeno y su testimonio en la vista en su fondo, se detiene en el tiempo en el año 1999, ¿cómo es posible concluir judicialmente que la prueba pericial estableció que el despido provocó la incapacidad permanente del recurrido? ¿Qué ocurrió desde el año 1999 hasta el 4 de octubre de 2001? ¿Cuál era la condición de salud del señor Díaz Hernández a la fecha del juicio? ¿Estaba total y permanentemente incapacitado para trabajar a esa fecha? ¿Cuál era el nivel general de actividad funcional de éste en ese**

---

[69] Testimonio del doctor Néstor Raúl Ortiz Santiago, transcripción del juicio en su fondo, *supra*, pág. 280. Nótese que en su interrogatorio directo se le preguntó:

  P  Según sus notas, para la última fecha [sic] en que usted vio a don Benjamín. Coteje a ver. ¿En qué año?

  R  La última vez en el '99.

[70] Apéndice del recurso de Certiorari, págs. 61-62.

momento?[71]   ¿Estaba tan incapacitado que no podía volver jamás a su trabajo?   La parte recurrida no desfiló prueba sobre esos extremos.

De otra parte, sabemos que el señor Díaz Hernández obtuvo de la Administración de Seguro Social Federal una determinación de incapacidad con carácter retroactivo al 20 de octubre de 2000. Indicamos que la pensión por incapacidad que le fue otorgada a partir de esa fecha por la referida Administración asciende a $650 mensuales.

**Ante la ausencia de prueba pericial sobre incapacidad permanente a la fecha del juicio, ¿podía el Tribunal de Primera Instancia descansar exclusivamente en la determinación de incapacidad de la Administración de Seguro Social Federal para concluir que el señor Díaz Hernández estaba total, permanente e irreversiblemente incapacitado a los fines de una reclamación de daños y perjuicios al amparo del artículo 16 de la Ley de Seguro Social para Choferes?**   El Tribunal de Apelaciones no consideró esta cuestión.

En sus conclusiones de derecho, el foro primario dispuso que el señor Díaz Hernández se encontraba permanentemente incapacitado. Expresó que "[a]sí lo determinó la Administración de Seguro Social...".[72]   Evidentemente, para llegar a tal

---

[71] Global Assessment of Functioning (GAF) Scale.   Véase DSM-IV-TR, Manual Diagnóstico y Estadístico de los Trastornos Mentales, Texto Revisado, versión española de la obra original versión inglesa, 4ta ed. revisada, Barcelona, Masson, S.A., 2002, págs. 37-41.   Véase, además, J. Mcdonald, Jr. & F. B. Kulick, Mental and Emotional Injuries in Employment Litigation, 2da ed., Washington D.C., BNA Books, 2001, págs. 140-143.

[72] Apéndice del recurso de Certiorari, pág. 56.

conclusión, descansó en la determinación de incapacidad de la Administración de Seguro Social Federal.

No obstante, en <u>S.L.G. Afanador v. Roger Electric Co., Inc.</u>,[73] caso de discrimen por sexo, en su modalidad de hostigamiento sexual en el empleo, el Juez Asociado Señor Fuster Berlingeri expresó, en Opinión de Conformidad, lo siguiente:

> ...<u>**no**</u> puede considerarse aquí que la determinación de incapacidad de la Administración del Seguro Social Federal **<u>es de carácter concluyente con respecto a la diferente determinación judicial que debe hacerse al amparo de la Ley</u>** sobre Hostigamiento Sexual en el Empleo, de si el trabajador hostigado puede o no ser repuesto en su cargo (énfasis nuestro).[74]

En dicho caso, similar a como ocurrió en el presente, la parte demandante obtuvo una determinación de incapacidad de la Administración de Seguro Social Federal. Sin embargo, nos negamos a otorgarle carácter concluyente a dicha determinación de incapacidad, a los fines de concederle al demandante, sin más, paga por pérdida de ingresos futuros o paga prospectiva. Establecimos que debía demostrarse ante el foro primario si el demandante estaba o no incapacitado; si a la luz de ello, procedía decretar la reposición en el empleo o, debía decretarse paga adicional por concepto de pérdida de ingresos futuros o paga prospectiva.

Al hacer una determinación de incapacidad, la Administración de Seguro Social Federal sigue un procedimiento reglamentario establecido y toma en consideración determinados

---

[73] 156 D.P.R. 651 (2002).

[74] Íd., pág. 680.

criterios de elegibilidad **para la otorgación de una pensión**, ajustados a los fines y propósitos de la legislación de seguridad social federal. Se trata de un procedimiento administrativo, en el cual las partes son el solicitante y la agencia federal.

**En cambio, el artículo 16 de la Ley de Seguro Social para Choferes tiene propósitos distintos a la legislación de seguridad social federal.** El referido artículo cumple el objetivo de **salvaguardar el derecho a la tenencia del empleo** de trabajadores que, como consecuencia de una enfermedad o accidente no ocupacional, se inhabilitan temporeramente para trabajar. Impone responsabilidad al patrono por el incumplimiento de las obligaciones que dimanan del mismo. Se trata de una responsabilidad limitada a remedios muy particulares, todos dentro del contexto de una relación obrero patronal. Bajo el referido artículo no está en juego la otorgación de una pensión por incapacidad.

En consecuencia, concluimos que una determinación de incapacidad de la Administración de Seguro Social Federal no tiene carácter concluyente ni sustitutivo de una determinación judicial de incapacidad para trabajar dentro del marco de una reclamación bajo el artículo 16 de la Ley de Seguro Social para Choferes.

Resolvemos que el Tribunal de Primera Instancia no podía descansar en la determinación de incapacidad de la Administración de Seguro Social Federal para concluir, en ausencia de prueba independiente de incapacidad permanente para

trabajar a la fecha del juicio, que el señor Díaz Hernández estaba en efecto total y permanentemente incapacitado para ello, dentro del contexto de una reclamación bajo el artículo 16 de la Ley de Seguro Social para Choferes. Erró el Tribunal de Apelaciones al avalar la actuación del foro primario.

A la luz de lo antes resuelto, es improcedente la partida de $572,000 otorgada por el foro primario a la parte aquí recurrida en concepto de daños por pérdida de ingresos futuros o paga prospectiva ("front pay").

Ahora bien, **¿se quedó sin remedios la parte recurrida ante el despido ilegal del que fue objeto el señor Díaz Hernández?** La respuesta a esta interrogante nos lleva a evaluar brevemente el segundo error señalado por Pneumatics.

C

En su segundo señalamiento de error, Pneumatics esgrime el planteamiento de que la determinación de incapacidad de la Administración de Seguro Social Federal tuvo la consecuencia de dejar sin remedios a la parte recurrida. Basa su argumento en la fecha de retroactividad de la referida determinación de incapacidad. Veamos.

Señala que el diagnóstico de "depresión mayor severa" del señor Díaz Hernández se hizo el 22 de octubre de 1997. Asimismo, ubica el alta que le dieron para trabajar, la solicitud de reinstalación en el empleo que este hiciera y su despido allá para el 14 de noviembre del mismo año. Aduce que, en vista de que la referida determinación de incapacidad tuvo carácter retroactivo al 20 de octubre de 1997, ello forzosamente

implica que cuando el señor Díaz Hernández le solicitó a Pneumatics la reinstalación en el empleo no se encontraba mentalmente capacitado para ser acreedor a la misma. Ello por razón de que el artículo 16 de la Ley de Seguro Social para Choferes requiere, para que proceda la reinstalación en el empleo, entre otras condiciones, que el empleado acredite estar mental y físicamente capacitado para ocupar el empleo al momento de solicitar la reinstalación.

El planteamiento de Pneumatics confronta el siguiente problema. Hemos resuelto que la determinación de incapacidad de la Administración de Seguro Social Federal no tiene carácter concluyente para los tribunales ni sustituye una determinación judicial de incapacidad para trabajar, dentro del marco de una reclamación bajo el artículo 16 de la Ley de Seguro Social para Choferes. Y Pneumatics no presentó prueba en el juicio. Simplemente se limitó a contrainterrogar a los testigos presentados por la parte adversa.

Ello tuvo el efecto de dejar incontrovertido el certificado médico de alta expedido el 13 de noviembre de 1997 por el doctor Ortiz Santiago. También dejó incontrovertido el testimonio en el juicio del galeno, en el sentido de que al examinar en esa fecha al señor Díaz Hernández lo encontró, aunque con ciertos rasgos de depresión, capacitado mentalmente para regresar a su trabajo a partir del 17 de noviembre del mismo año. Es menester enfatizar aquí que la determinación de incapacidad que hizo la Administración de Seguro Social Federal y el carácter retroactivo de la misma, tuvieron su fundamento en factores o

criterios particulares, ajenos al espíritu y propósitos del artículo 16 de la Ley de Seguro Social para Choferes. Así las cosas, si Pneumatics deseaba que el tribunal sentenciador resolviera que el señor Díaz Hernández no estaba mentalmente capacitado para trabajar cuando le solicitó la reinstalación en el empleo allá para el 14 de noviembre de 1997, debió presentar prueba pericial independiente al respecto. No debió descansar en el hecho de que la determinación de incapacidad de la Administración de Seguro Social Federal fue retroactiva al 20 de octubre de 1997.

A la luz de anterior, disponemos que el señor Díaz Hernández tiene derecho al remedio de salarios dejados de percibir desde la fecha en que debió ser reinstalado en su empleo, esto es, desde el 17 de noviembre de 1997, hasta la fecha en que presentó ante el Tribunal de Primera Instancia su enmienda a la Querella. Recordemos que en la Querella, el señor Díaz Hernández solicitó del foro primario que ordenara su inmediata reposición en el empleo. No obstante, el 28 de marzo de 2000, enmendó la misma y alegó en ese momento, y por primera vez, que se hallaba permanente e irreversiblemente incapacitado para trabajar. Tal alegación tiene el efecto de interrumpir el remedio de salarios dejados de devengar, ya que el mismo está inexorablemente atado a la capacidad para trabajar. Es decir, el artículo 16 de la Ley de Seguro Social para Choferes consagra dicho remedio, pero condiciona su concesión a que el empleado esté mental y físicamente capacitado para trabajar. Al enmendar la querella en la forma en que lo hizo, el propio señor Díaz Hernández

reconoció que, al menos desde la fecha de su presentación, no cumplía con tal condición.

Hemos realizado el cómputo de los salarios dejados de percibir a que tiene derecho el señor Díaz Hernández. Es el siguiente: **123 semanas y un día** hábil de trabajo desde el 17 de noviembre de 1997 hasta el 28 de marzo de 2000 **x $320 de salario semanal = $39,424.**

Por otro lado, el Tribunal de Primera Instancia le concedió al señor Díaz Hernández y a la señora Carrión Galarza $30,000 y $15,000, respectivamente, por concepto de angustias mentales.

Hemos leído con detenimiento el Alegato de Pneumatics. El único planteamiento de objeción que esgrime en relación con la concesión de dichas partidas lo encontramos a la página siete (7) del escrito. Allí expresa:

> [E]n estos casos los daños y angustias mentales concedidos al empleado no proceden. Éstos no son concedidos en esta jurisdicción en reclamaciones de esta naturaleza.[75]

Según explicamos antes, el artículo 16 de la Ley de Seguro Social para Choferes contempla, ante una violación patronal a la reserva de empleo consagrada en el mismo, además del derecho a la reposición en el empleo y al recobro de los salarios dejados

---

[75] Estas expresiones son hechas por el patrono en el último párrafo de la "Breve Relación de Hechos" de su alegato. No forman parte de ninguno de los señalamientos de error del recurso ni de sus respectivas discusiones. Por otro lado, como se desprende de la cita, Pneumatics tampoco cuestiona la cuantía de las partidas. Por lo tanto, nos abstenemos de intervenir con ellas. No constituyen cuantías ridículamente bajas o exageradamente altas. En nuestra función apelativa, reiteramos la norma de abstención judicial fundada en criterios de estabilidad y de respeto a los tribunales de primera instancia. Urrutia v. A.A.A., 103 D.P.R. 643 (1975).

de percibir por el trabajador afectado, el remedio de daños y perjuicios. En palabras del propio artículo, dispone que el patrono "...**además** le responderá [al trabajador] **de todos** los daños y perjuicios que le haya ocasionado" (añadidura y énfasis nuestro). La expresión "además le responderá de todos los daños y perjuicios" no puede ser más clara. La voluntad del legislador queda elocuentemente expresada en la frase. Éste no distinguió entre daños físicos, materiales o morales para efectos del derecho al resarcimiento conferido. Todo lo contrario. El legislador utilizó el adverbio "además" y el adjetivo "todos". Esa combinación de palabras creó un efecto inclusivo contundente en cuanto a los daños y perjuicios reclamables bajo el referido artículo. Estos son todos los daños y perjuicios patrimoniales y no patrimoniales cuya existencia hemos reconocido en nuestra jurisdicción.

Resolvemos, por lo tanto, que el patrono que incumple con las disposiciones del Artículo 16 de la Ley de Seguro Social para Choferes está sujeto a compensar todos los daños sufridos por el trabajador afectado por el incumplimiento, lo que incluye angustias mentales.

En vista de todo lo anterior, dejamos intacta la concesión de daños por concepto de angustias mentales hecha a los aquí recurridos por el Tribunal de Primera Instancia, la cual fuera confirmada por el Tribunal de Apelaciones.[76]

---

[76] Nótese, además, y según indicáramos en la relación de hechos de esta Opinión, que Pneumatics no pagó las primas del Seguro Choferil, lo que imposibilitó que el señor Díaz Hernández

De otro lado, consideramos razonable la concesión que hiciera el Tribunal de Primera Instancia de un veinticinco (25) por ciento de la suma concedida por concepto de honorarios de abogado.   No intervendremos con dicha determinación. Naturalmente, la cantidad de dinero por dicho concepto ha quedado reducida a **$21,106**, como consecuencia de la reducción de la suma que corresponde a la parte recurrida.[77]

Por los fundamentos antes expuestos, se dictará Sentencia revocando la partida de "salarios futuros dejados de percibir" o "lucro cesante" concedida a la parte recurrida y condenando a la parte peticionaria, Pneumatics & Hydraulics, Inc., a satisfacer a la parte recurrida la suma de $39,424 por concepto de salarios dejados de percibir, $30,000 y $15,000, respectivamente, al señor Díaz Hernández y a la señora Carrión Galarza, por concepto de angustias mentales, las costas del proceso, y  a satisfacer al representante legal de la parte recurrida, la suma de $21,106 por concepto de honorarios de abogado.   Así modificada, se confirma la Sentencia del Tribunal de Apelaciones.


                              Efraín E. Rivera Pérez
                              Juez Asociado

_____

pudiese cobrar los beneficios del mismo.   Ese sólo hecho, constituye un daño resarcible.   Adviértase que la esposa del señor Díaz Hernández no trabajaba.   El matrimonio tenía tres (3) hijos, todos de edad escolar.   Para alimentar a su familia tuvieron que recurrir al Programa de Asistencia Nutricional (P.A.N.).   Tanto éste como su esposa exteriorizaron en sus testimonios en el juicio las preocupaciones y ansiedades que todo ello les generó.   Véase determinaciones de hecho 38-43 de la Sentencia del Tribunal de Primera Instancia, Apéndice del recurso de Certiorari, págs. 49-50.

[77] Por el resultado al que llegamos, entendemos innecesario discutir el tercer señalamiento de error.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Benjamín Díaz Hernández, et. al.

    Demandante Recurrida

        v.

                            CC-2004-961

Pneumatics & Hydraulics, Inc.,
et al

    Demandado Peticionario

SENTENCIA

San Juan, Puerto Rico, a 17 de octubre de 2006.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dictará Sentencia revocando la partida de "salarios futuros dejados de percibir" o "lucro cesante" concedida a la parte recurrida y condenando a la parte peticionaria, Pneumatics & Hydraulics, Inc., a satisfacer a la parte recurrida la suma de $39,424 por concepto de salarios dejados de percibir, $30,000 y $15,000, respectivamente, al señor Díaz Hernández y a la señora Carrión Galarza, por concepto de angustias mentales, las costas del proceso, y a satisfacer al representante legal de la parte recurrida, la suma de $21,106 por concepto de honorarios de abogado. Así modificada, se confirma la Sentencia del Tribunal de Apelaciones.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri concurre con el resultado sin opinión escrita. La Jueza Asociada señora Fiol Matta disiente sin opinión escrita. El Juez Asociado señor Rebollo López no intervino.

                    Aida Ileana Oquendo Graulau
                    Secretaria del Tribunal Supremo